## Case No. 11,133.

### PICQUET v. SWAN et al.

[4 Mason, 443.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1827.

TRUSTEE PROCESS—ACT OF MASSACHUSETTS, 1794—POST-NUPTIAL SETTLEMENTS—POWER OF APPOINTMENT—NEW TRUSTS—WIFE'S SEPARATE ESTATE—WILL OF FEME COVERT.

1. Of the true nature and extent of the trustee process authorized by the statute of Massachusetts of 1794 (chapter 65).

[1] [Reported by William P. Mason, Esq.]

2. It seems that it does not authorize an attachment of any property which is not tangible, and might be levied upon on execution, if discovered, or of any debts or credits, where the trustee sets up any title or claim adverse to that of the debtor: for example, where the trustee claims under a post-nuptial settlement by the debtor.

3. Of the general validity of post-nuptial settlements. A post-nuptial settlement, made by a stranger upon the wife, is good, unless expressly dissented from by the husband. A post-nuptial settlement made by the husband upon his wife, if for a valuable consideration, is valid; and even if voluntary, if bonâ fide, and the husband be not indebted at the time, or it be not disproportionate to his means, taking his debts and his situation into consideration, it is valid.
[Cited in Barnett v. Goings, 8 Blackf. 286; Gassett v. Grout, 4 Metc. (Mass.) 488.]

4. In such a post-nuptial settlement a power of appointment and to create new trusts may be reserved to the wife, toties quoties, and it is no objection to it or to the title derived under the secondary trusts and appointments.

5. Where such a power of appointment is absolute and universal in its terms, the wife may exercise it, and create new estates on new trusts.

6. The income or profit arising to the wife from such post-nuptial settlements follows the nature of the principal estate, and cannot be taken by the husband or his creditors, but belongs to the wife, and is subject to the control and disposition of the wife. It is her separate property, and when invested by her, will be protected for her use. Into whose-soever hands it comes, it is clothed with the trust for her, and not for her husband, even when no trustees are expressly provided for in such a case.

7. If a wife, under such circumstances, lives separate from her husband, the furniture &c. of her house will be presumed to be purchased out of her own property; and will not, on her death, go to her husband, or his creditors; but to her own appointee.

8. What circumstances furnish presumptions of exclusive ownership of furniture &c. in the wife.

9. Where the persons sued as trustees of the husband, claim title as appointees and trustees under the will of the wife, and the will has not been admitted to probate, they cannot be adjudged trustees.

10. The will of a feme covert under a power reserved in a settlement, must be proved in our courts of probate before it can be acted upon elsewhere, exactly as the wills of persons sui juris. The courts of probate have exclusive jurisdiction of such questions.
[Cited in Cassels v. Vernon, Case No. 2,503.]
[Cited in Allison v. Smith, 16 Mich. 422. Cited in brief in Cutter v. Butler, 25 N. H. 350.]

11. If a feme covert gives a legacy in her will to her husband, out of her separate property, for his maintenance, under a power of appointment, the executors are not liable to be attached as trustees of the husband until after a probate of the will, and the taking upon themselves the administration thereof. An executor is not liable to be charged as the trustee of a legatee, in a foreign attachment.
[Cited in Stratton v. Ham, 8 Ind. 87. Cited in brief in Short v. Moore, 10 Vt. 448.]

12. Quære, if a legacy given by way of annuity to a husband for his maintenance can be attached in the hands of the executors. Is not such an annuity in its very nature a sum to be paid personally to the husband by the executors; as the bounty of the testator?

13. Property pledged, and on which the party has a lien, is not liable to be attached by a trustee process.

[Cited in Briggs v. Walker, 21 N. H. 77.]

14. Quære, whether a wife making advances out of her separate property to her husband, upon an hypothecation of his personal estate, may not, in equity, hold the same as against his creditors.

15. A trustee may, in a foreign attachment process, set off against a debt or claim due from him to the debtor, any claim he has against the debtor, which he could set off in an adverse suit at law brought by the debtor himself.

[Cited in Allen v. Hall, 5 Metc. (Mass.) 266; Capen v. Alden, Id. 271.]

16. Where persons, sued as trustees in a foreign attachment, assert an adverse title to the property in a third person, as her separate property, they are not bound to answer how they have disposed of it, for her use, from time to time.

[Cited in Wright v. Foord, 5 N. H. 180.]

[17. Cited in Cutter v. Butler, 25 N. H. 350, 359; Marston v. Norton, 5 N. H. 210. And cited in brief in Fisher v. Kimball, 17 Vt. 326, to the point that at common law a will by a married woman disposing of her freehold estates is void.]

[18. Cited in Sexton v. Amos, 39 Mich. 699, to the point that there must be a clear admission of goods, effects, or credits not disputed or controverted by the supposed trustees, before they can be truly said to have them in deposit or trust.]

[19. Cited in Crossman v. Crossman, 21 Pick. 24, to the point that the statements in the trustee's answer are to be taken as true, and that this rule extends to assertions made on his belief of facts derived from other sources of information, as well as from his personal knowledge.]

This was a foreign attachment, commonly called a trustee process [brought by Cyrus B. Picquet]. The principal debtor [James Swan] did not appear, or make any defence in the cause; and it came on to be heard upon the answers made by the trustees, who denied that they had any property of the debtor or in their hands liable to attachment; and having made a special disclosure of all the facts, moved the court for their discharge. The motion was resisted. [The plaintiff had previously failed to obtain judgment in an action of assumpsit. Case No. 11,132.]

J. B. Davis and J. T. Austin, for plaintiff.
William Sullivan and William Prescott, for trustees.

STORY, Circuit Justice. This suit is brought by the plaintiff, an alien and subject of the king of France, against James Swan, a citizen of this state, as principal debtor, and against certain persons who are summoned, as his trustees, viz. Harrison G. Otis, William Sullivan, and Hepzibah C. Howard, to recover the amount of certain bills of exchange belonging to the intestate, and yet due and unpaid by Swan. The process is familiarly known among us by the appellation of the trustee process, and is more generally known elsewhere by the appellation of foreign attachment. It has its origin in the statute of 1794 (chapter 65), which provides, that any creditor, entitled to an action against his debtor, "having any goods, effects, or credits, so entrusted, or deposited in the hands of others, that the same cannot be attached by the ordinary process of law, may cause not only the goods and estate" of the debtor "to be attached in his own hands or possession &c., but also all his goods, effects, and credits so entrusted and deposited," &c. by an original writ, by which the debtor and the supposed trustee are summoned to appear, and answer to the suit in the manner prescribed by the act. In the present case the principal has not yet appeared; but the persons sued as trustees have appeared pursuant to the statute, and have made regular disclosures of facts under oath; and they now demand that they be discharged from the suit, upon the ground, that these disclosures establish that they have no goods, effects, or credits of the debtor entrusted or deposited with them in the sense of the statute. The case, so far as respects them, is to be tried upon their answers, and no evidence aliunde is admissible to controvert or explain the facts stated therein. This is the known course under the statute, and has never been broken in upon by the legislature, except in a class of cases not necessary on this occasion to be noticed. I own that I am one of those, who are not inclined to give a larger operation to the statute than what its words clearly import. It is an extraordinary process, and from its very nature can afford but a very imperfect administration of rights and remedies as to the litigant parties. Nor as far as my limited experience has gone, has it enabled me to say, that in complicated transactions, where various and conflicting rights have been brought forward for controversy, the result has in a general view been such as entitles it to peculiar public favour on account of its advancement of public justice. Cases, like the present, full of nice law and refined equity, would seem hardly within its scope, and are far more fitted to be decided upon a bill in equity, where all the parties in interest may be brought before the court, and the whole facts may be put in controversy, and supported or repelled by the answers of the parties, as well as by evidence drawn from disinterested sources. If I were called upon to put a construction upon the words of the statute for the first time, I should not hesitate to say, that it was meant to be limited altogether to cases where goods and effects, such as are liable to execution in ordinary cases, and are tangible, corporeal property, were in the hands and possession of the supposed trustee, for the sole use and benefit of the debtor, and under no claim of right or interest therein, contested or uncontested on the other side; or to acknowledged deposits of money or credits admitted, as real balances due from the trustee in money transactions or matters in account, between the trustee and the debtor. And that it did not extend to cases

where the trustee controverted the right of the debtor to any such goods, effects, or credits altogether, or asserted any adverse interest, title, or claim. This appears to me the true intention of the statute, as it is expounded by the simple words of the enacting clause, and more fully by the recital of the preamble. Whether decisions have gone to an extent beyond this reach of the words, it is not now necessary to consider. If they have, it may become my duty to follow them in the administration of local law; but I should hesitate much, before I should take a single new step, or make any new inroads upon the natural meaning of the words. Especially should I feel an almost insuperable repugnance to such a step, when it might vitally affect the interests of third persons not before the court, who, in the character of cestuis que trust, or beneficial proprietaries, might have their rights concluded without any legal opportunity of presenting their whole merits. The foreign attachment custom of the city of London is probably the common origin of the statute process in the different states of this Union; and it is quite apparent, that the principles of that process have never been supposed to reach cases, where there were any trusts set up by the party in favor of third persons. See Com. Dig. "Attachment," C, D; Blacquiere v. Hawkins, 1 Doug. 378. See, also, Barnes v. Treat, 7 Mass. 271. In the present case it is most manifest, that all the parties in interest are not before the court; and that if the merits of the whole proceedings spread upon the record are to be examined into, and decided upon, it is quite probable, that the rights of third persons may be most materially affected. I throw out these suggestions, not for the purpose of escaping from a decision upon the general questions presented in the cause, and which have been argued with so much ability and learning; but with the hope, that they may attract the attention of abler minds, valere quantum valere possent.

The first question presented by the disclosures arises from the post-nuptial settlements stated in the case. The first is by an indenture tripartite of the 14th of June, 1796, between John Coffin Jones, of the one part, James Swan and Hepzibah his wife of the second part, and Henry Jackson and Joseph Russell of the third part, reciting that Jones had on that day transferred to Jackson and Russell 86,000 dollars, of the five and a half per cent. stock of the United States, in trust for the said Hepzibah, with the consent of her husband. The trusts expressly authorize her to receive the whole, principal and interest, to her separate use during her coverture, and to dispose of the same as she may please, during her life-time, and afterwards to appropriate the same to such persons as she should by deed, or by any writing purporting to be a last will and testament, limit, direct, and appoint. It does not appear, from any recital in this indenture or other-

wise, from whom the property so placed in trust was derived. Another indenture was executed between the same parties on the 25th of April, 1797, by which the additional sum of 6,000 dollars on the same stock was secured to Mrs. Swan upon the like trusts. On the 10th of October, 1796, an indenture was made between Henry Jackson of the first part, John C. Jones and Joseph Russell of the second part, and Mr. Swan and his wife of the third part, whereby certain real estate and mortgage securities thereon, then held by Jackson, were conveyed to Jones and Russell, upon trusts substantially similar in effect, though varying in some of the provisions from those before mentioned, and including a power of appointment of such estates by Mrs. Swan. I do not dwell on them, because nothing particularly grows out of them in the present controversy. By another indenture between the same parties, executed on the 20th of November, 1797, certain other lands were conveyed upon the like trusts. On the 28th of July, 1798, by another indenture, General Jackson conveyed certain other lands to Jones and Russell upon like trusts. Neither Mr. Swan nor his wife were parties to this indenture; but by a deed of the 16th of July, 1800, he gave his assent thereto. In this last indenture are contained the estate called the Greenleaf estate, now the Washington Gardens, and also the Mount Vernon Lands, so called, in Boston.

Mrs. Swan, pursuant to her power of appointment during her life-time, made sundry conveyances of the real estates above-mentioned, upon like trusts, for her separate use, which lands, by intermediate conveyances, came to the trustee, William Sullivan; and by an indenture of three parts, made on the 30th of March, 1825, between the said William Sullivan of the first part, Jonathan Amory, Richard Sullivan, and James Sullivan of the second part, and James Swan of the third part, the same estates were conveyed to the said parties of the second part, upon like trusts, and for the purpose of enabling Mrs. Swan to execute an appointment thereof, in the nature of a last will and testament. On the 25th of April of the same year, another indenture was made between the trustee, William Sullivan, of the one part, Peter O. Thacher and James Sullivan of the second part, and James Swan of the third part, whereby certain personal estate, then in the hands of the said William Sullivan, belonging to Mrs. Swan, and for her separate use, was conveyed to the parties of the second part, for the separate use of Mrs. Swan, and to enable her to dispose of the same in her life-time, and afterwards by deed, or by writing, purporting to be her last will and testament, to appoint, direct, and dispose of the same. There was a supplementary agreement of the same date, between the same parties, containing further provisions respecting future personal estate, which

might accrue to Mrs. Swan, and the investments of the property already assigned by the preceding indenture. Mrs. Swan, in pursuance of these several indentures, made a certain instrument, purporting to be her last will and testament, dated the 29th of April, 1825, and thereby executed, in the fullest manner, her powers of appointment over the real and personal property, which passed under all the indentures above-mentioned. By this testamentary instrument she bequeathed the whole of her real and personal estate to William Sullivan, Harrison Gray Otis, and William Foster Otis, whom she also made her executors, in trust, to pay certain legacies and annuities, and to distribute the residue among her three daughters, with the usual powers of sale, &c. Mrs. Swan died in August, 1825; and this testamentary instrument has never yet been proved and allowed in any probate court in Massachusetts; and the executors have not as yet applied for probate, or taken upon themselves the discharge of the trusts therein contained. It is further alleged, in the answer of William Sullivan, that James Swan assented to the making of the same testamentary instrument, when the same was made, and since the decease of Mrs. Swan he has also assented to the same, and accepted the provision therein made for his benefit. There is no proof, in the answers, what was the true origin of the various settlements above stated. The trustees do not undertake to state them, expressing their own ignorance of the subject. At the same time, two of them assert, that Mrs. Swan originally possessed by devise, from a Mr. Dennie, an estate, real and personal, beyond the amount of that included in all the settlements, which was received by Mr. Swan, and lost in his commercial enterprises; that he subsequently retrieved his fortune, and became possessed of great wealth; and that, if these settlements were made out of his property, they were made as a compensation for the property of his wife, so received and lost by him, upon the plain principles of equity and justice.

Now, upon this summary exposition of the facts, stated in the answers, the question arises, whether these post-nuptial settlements are, or are not, valid in point of law. If valid, their importance, in the future inquiries in this cause, will presently be seen. Upon any view, which I am able to take of the facts now before the court, and it is upon these facts only that I am permitted to judge, there does not seem the slightest ground to impeach these settlements, or any of them. Nothing is more clear, both upon principle and authority, than that a post-nuptial settlement, made by a stranger upon a wife, is good and operative, in point of law, unless it is dissented from by the husband. And in this case we have the assent of the husband, expressed in the most formal manner, by becoming a party to most of the instruments, and by yielding his positive assent

in all other cases. If, therefore, these settlements were made out of their own property, by strangers, for the benefit of Mrs. Swan, they are incontrovertibly good. And certainly the court cannot judicially say, that such was not the real posture of the case. There, is nothing, by which the court is at liberty to say, that the property, so secured and settled, was derived from Mr. Swan. I may conjecture, that it was so, or might have been so, if I were at liberty to deal with conjectures upon subjects of such grave importance. But the law has wisely prohibited any latitude of this sort. The court must deal only with facts, standing upon the face of the record. And after thirty years, when many of the parties are dead, in an examination of persons, not originally connected in privity with these settlements, it would be the extreme of rashness to adventure upon such perilous presumptions. But, supposing the property so settled were derived from Mr. Swan; it by no means follows, that these settlements are open to impeachment on that account. It is common learning, that a post-nuptial settlement may be made for a valuable consideration, by a husband, upon and for the benefit of his wife. And even a voluntary settlement, without such valuable consideration to support it, would be upheld, if the husband were not in debt at the time, or the settlement were not disproportionate to his means, taking into view his debts and his situation. In short, if the settlement were bonâ fide, reasonable, and clear of any intent, actual or constructive, to defraud creditors, it would be valid. I do not pretend to cite the cases on this subject. The doctrine will be found stated, with admirable clearness and accuracy, in the excellent Commentaries of Mr. Chancellor Kent (2 Kent, Comm. 145), and in the treatises of Mr. Atherley on marriage settlements (chapter 11, pp. 155, 175, 176), and Mr. Roper, on the law of property between husband and wife (chapter 8, § 2, pp. 301, 304, 306, 307, 309, etc.). The subject is also very amply discussed in Reade v. Livingston, 3 Johns. Ch. 481, and Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229. See Battersbee v. Farrington, 1 Swanst. 106; Kidney v. Coussmaker, 12 Ves. 136. It is the less necessary to dwell on this point, because the counsel for the plaintiff have, with great frankness and propriety, admitted the general law on this subject, and also, that they are not able to persuade themselves, upon the facts stated, that enough appears to entitle the court to overturn these settlements. This appears to me a conclusion altogether irresistible. The same observations apply with equal, nay, with increased force to the devises to Mrs. Swan, in Gen. Jackson's will in 1809; for all these devises expressly refer to the antecedent settlements, and give the whole property upon similar trusts. It appears to me, that his will is sufficiently certain, in every particular necessary to give

effect to the devise, and establish the trusts. "Id certum est, quod certum reddi potest." In the construction of wills, courts of law, as well as of equity, grant a most favourable consideration to the intentions of the testator, and will give them form and efficiency, as far as they may, consistently with principle. however imperfectly such intentions may, in a technical sense, be brought forth and embodied. But it is argued, that, however good these post-nuptial settlements may have been in their origin, yet if they have since been abandoned or extinguished in point of law, the property thereby secured falls with them, and reverts to the power and use of the husband, and is attachable by his creditors. In support of this proposition it is said, that the original power of appointment, secured by them to Mrs. Swan, did not authorize her to create new estates upon new trusts, with powers of appointment reserved to herself toties quoties; and that, when once she had exercised her original power of appointment, it was gone forever, and no reservations, in the instruments so executing it, of new powers of appointment, were valid; in short, that such successive powers and trusts were void, unless provided for in the original post-nuptial settlements.

Now, if the argument itself were well founded, in point of law, that no such new powers of appointment could be successively exercised, unless provided for in the original settlements; yet the consequence, deduced therefrom, would not follow. In a court of equity it is impossible, that an instrument, affecting to execute a power of appointment, but disappointed in all its objects and intentions, would be held a valid execution of the power. If the estates appointed, cannot be created and possess life, as the appointer intends and provides; if the estates are created as trusts, and not as beneficial estates, and yet cannot prevail, except as absolute, beneficial estates, under the power, the true manner, in which a court of equity would contemplate them, would be, as mere nullities, and void executions of the power. It would certainly not create beneficial estates in the appointees, where none were intended; or make those interests absolute, which were expressly declared to be conditional. It would, on the other hand, hold, that the power of appointment was not well executed, because the manner of execution was beyond, and exceeding the power. But it appears to me, that the argument itself proceeds on a false foundation. This is not the case of a power limited in its effect and means, and bound to precise estates and purposes. The power of appointment in Mrs. Swan, in all these settlements, is contemplated as absolute, covering the whole title and interest in all the property, without control or condition. Now, no position is more clear, than that he, who possesses the whole power of disposal, may exercise it partially. The absolute owner may part with the whole or part of his rights, upon conditions or limitations, for beneficial, or for fiduciary interests. This principle results from the very nature of absolute ownership over property; and, of course, includes all modifications short of an absolute disposition of the whole interest. To entitle Mrs. Swan to dispose of her separate property under these settlements, upon new trusts and new appointments, it was not necessary to provide, in the original settlements, for such successive trusts and appointments. The law silently annexes such rights, as of course, to the general dominion and absolute ownership, reserved by those settlements to her, over the property as her own separate property. In either view, then, the argument is unmaintainable. See Jaques v. M. E. Church, 2 Johns. Ch. 543; 17 Johns. 548.

In the next place, it is argued, that, however valid may have been the original settlements, or subsequent trusts, still the moment the proceeds, or income, arising from the property so secured, were paid by the trustees into the hands of Mrs. Swan, they ceased to be trust funds, and were immediately liable to attachment, as her husband's property, in the same manner, as if they had been her property, not secured by trusts. This proposition is utterly untenable in a court of equity. It involves, in effect, a total defeat of the original trusts. These trusts were to secure the income and proceeds to the sole and separate use of Mrs. Swan, with an unlimited power to dispose of them as a feme sole. Nothing is more clear, than that the separate property of a feme covert, secured or given to her separate use, will be upheld for her use by a court of equity. Into whose ever hands the same may come, whether of a stranger, or even of the husband, if it comes clothed with the trust, and with notice of it, the party, so possessing it, becomes a trustee for the feme covert. It is in no sense the property of the husband, and can never become his, except by a voluntary appropriation of it to his use by the wife herself. She may invest it as she pleases; and appropriate it to furniture, or pictures, or plates, or jewelry, or bank stock, or other securities, or personal ornaments, or paraphernalia, still it is her own, and cannot be touched while she retains her power and dominion over it. For these principles I do not cite particular authorities. They are spread everywhere over the doctrines on this subject, which have been long entertained by courts of equity, and are now generally considered as incontrovertible. Indeed, the moment courts of equity decided, that femes covert could hold separate property to their own use, as femes sole, it was a necessary consequence, that the protection of it should be as universal as the right. The principle is not even confined to cases, where trustees are appointed to preserve the trust; but it extends to cases,

where no trustees are interposed, and yet the nature of the property, or the express provisions of the donation, direct it to be for the separate use of the wife. Even the husband himself will, in such cases, be adjudged a trustee for the benefit of his wife. See Bennet v. Davis, 2 P. Wms. 316; Fettiplace v. Gorges, 3 Brown, Ch. 7; 1 Ves. Jr. 46; Rich v. Cockell, 9 Ves. 369; 1 Thom. Co. Litt. 132, note n; 3 Thom. Co. Litt. 309, note o; Id. 314, note r; Ath. Mar. Sett. c. 21, p. 330; Id. c. 22, p. 334; 1 Madd. Ch. Prac. 376; 2 Rop. Husb. & Wife, pp. 179, 184, 185, 226, 227, c. 19; Id. c. 17, § 3, b, 140, 143; Id. p. 151, etc., c. 18; Jaques v. M. E. Church, 2 Johns. Ch. 548; 17 Johns. 548; 2 Kent, Comm. 136, etc. In the next place, it is argued, that the personal property in the possession of Mrs. Swan, at the time of her decease, is to be deemed her husband's; and especially the furniture, books, silver plate, and pictures, which are stated in the answers. Now that depends altogether upon the question, whether these were her own separate property at that time, either by original purchase from her own separate property, or as proceeds of her original property, or by any other equitable title as against her husband. For if they were, they are not liable to attachment as her husband's property, but must pass according to her own appointment and disposition of them.

We are therefore necessarily led to the inquiry, whether the furniture, books, silver plate, and pictures, above mentioned, are the separate property of Mrs. Swan. It is said, that primâ facie these ought to be presumed to be the property of the husband, because found in his family, and he, being a man of fortune in 1796, might well be presumed to have purchased them as a part of his family establishment. Such a presumption might arise under ordinary circumstances. But there are various circumstances in the present case, which repel the inferences deducible from the ordinary relation of husband and wife. In the first place, Mr. Swan left America in 1798, and has never since returned. His absence abroad was voluntary until the year 1808; and it has, since that period, been compulsive, he having been, during all the intermediate time, in prison in France, under an arrest by civil process, and as we are given to understand, upon an execution for debts. During the whole of this period (except during a visit of his wife to France in 1804), he has left the whole of his family under the control and management of Mrs. Swan, who has maintained them out of her separate property; and Mr. Swan has never, at any time, interfered with the furniture, books, plate, or pictures, which were in her possession. For a considerable part of this period, almost for twenty years, he has been a distressed man, not without means indeed, but embarrassed and in difficulties; and Mrs. Swan has advanced him, out of her separate property, not as a gift, but as a debt, or loan,

between thirty and forty thousand dollars. In the next place, none of the furniture has been traced back to a period antecedent to the settlement in 1796; and from the facts in the case, it is most apparent, that a great portion of the old furniture was sold by Mrs. Swan, and new furniture purchased by her on her occasional changes of residence, and to furnish her new houses. No means are pretended for such purchases, except out of her separate property; and if so purchased, it remains her sole property. The two iron bedsteads referred to in the supplementary answer of Mrs. Howard, are the only articles of furniture now remaining, which are known to have been in existence in 1796; and these are now in the Dorchester house, where they were in that year. They have never been taken into possession by any of the parties now before the court, except as property supposed to belong to Mrs. Swan, and to be disposed of by her will, and shut up for preservation. In the third place, Mrs. Swan remained in the possession of all the furniture, plate, books, and pictures, claiming the same as her own separate property, and exercising all sorts of acts of ownership over them by sale and otherwise, without any intervention of her husband, from the time of her husband's departure from America, in 1798, until her death, in 1825, a period of twenty-seven years. Such a possession, so notorious and open, under circumstances like the present, furnishes a very strong presumption of right on her part. See Gore v. Knight, 2 Vern. 535. In common cases of persons not under coverture, it would afford an irresistible presumption of right. This presumption of right and acquiescence on the part of Mr. Swan, up to the period of her death, admits of various corroborative explanations. It may have arisen, if the furniture, plate, books, and pictures were in 1796 the property of Mr. Swan, that they were contained in some distinct settlement of the personal estate on Mrs. Swan, which has since been lost. Or they may have been subsequently purchased by her of her husband, out of her separate property, to relieve his necessities, and thus, equitably, have vested an exclusive interest in her. Or they may have been taken and held by her as equitable security, with his assent, pro tanto, for advances made to him. And if since purchased, they may have been purchased by her out of her separate property, and used to grace her residence, as means suited to her own fortune and rank in life. The answers of the trustees embody various explanations of this nature, which are certainly entitled to great weight, though they explicitly state that they are in total ignorance of the general origin and ownership of the property, and the circumstances under which it came to Mrs. Swan; but they, at the same time, express an unequivocal belief that it was the separate property of Mrs. Swan, and did not belong to her husband. In the fourth place, the recitals in Mrs. Swan's will,

which have been relied on by the plaintiff's counsel, appear to point to this property, and show that she meant to treat it as her separate property, and claim title to it as her own. The words, "whereas I am or may be possessed of divers chattels, furniture, &c. as of my own separate property, which are, and were intended, and ought to be, subject to my appointment," &c. do not indicate any doubt as to the title; but are expressive merely of the status rei, the understanding of the testatrix, and the claim asserted by her. In the fifth place, as to the plate, there is very strong affirmative proof of the absolute right claimed by her over it for the purpose of sale; and what is not immaterial, it was deposited by her with General Jackson, an intimate friend of herself and her husband, as early as 1802, as her own property, and was then recognised by him "as the property of Mrs. H. C. Swan." It is stated also in Mrs. Howard's answer, that all but a small portion of this plate was obtained, or first known to the family, after 1796; and that even that portion was understood to be family plate, which came to Mrs. Swan by inheritance or bequest. In the last place, the trustees expressly assert that, according to their best knowledge and belief, the whole of this property was not only claimed by Mrs. Swan, as her separate property, but was in fact hers, so far as they have any means of information: That they claim it, as such, and not otherwise: That they do not admit any right or title to the same in Mr. Swan: That they admit no privity with him in respect to it; and that they claim title to it under Mrs. Swan's will as beneficiaries, or trustees, or executors, and utterly deny to hold the same in any other character; and that the same will has hitherto been delayed from probate; and the pendency of this and other suits by the plaintiff, has prevented the due execution of the will.

Against all this, there is nothing but a post-mortuary claim of Mr. Swan to the plate, books, and pictures; for he lays none to the furniture. He never intimated any claim to them until after Mrs. Swan's death, and that claim is now resisted on behalf of her devisees and legatees, by the trustees and executors appointed by her will.

Now upon this posture of the case, it is impossible for the court to adjudge the parties sued in this case to be trustees of all, or any part of the property disclosed in the answers, unless it is prepared to pronounce, that it ought so to decide in opposition to claims set up by the trustees, not only adverse to, but inconsistent with, any title to the same in Mr. Swan. It has never yet been decided, to my knowledge, that in our process of foreign attachment a person can be adjudged a trustee of any debtor, who sets up a title and interest adverse to that of the debtor, and denies his right to any "goods, effects, or credits" in his hands. It seems to me utterly inconsistent with the professed objects of the statute, to suppose any such case to be within its contemplation. There must be a privity in contract or interest between the parties, to bring any case within the reach of that statute. How is it possible to say, that any goods, effects, or credits are deposited with, or entrusted to, a party by the debtor, when the party has no privity with him, asserts his interest to be under a third person, who holds an adverse interest, and on his own account and for other uses, has deposited such goods, effects, and credits with the supposed trustee? An attempt to push the statute to this extent, would trench upon the constitutional right of the parties to the trial by jury in all controversies respecting property; for I know of no cases in which, under this process, any such course had been used and practised before the adoption of the convention of 1780. Especially it seems to me, that such a course cannot be contemplated, when all the parties in interest, as cestuis que trust, or otherwise, are not before the court, and when, from the nature of the case, different conclusions on the same facts might be legitimately drawn by a court and a jury. If ever such a doctrine shall be engrafted into our local jurisprudence, it will be time enough to consider, whether it is the duty of this court to follow it. At present I stand upon the ground, that it is not, and, as far as I can read the language, it cannot be established upon any just exposition of the statute. There must be a clear admission of goods, effects, or credits, not disputed or controverted by the supposed trustees, before they can be truly said to have them in deposit or trust. How far, indeed, they may be admitted to set up claims in the nature of a set-off against the admitted property and credits of the debtor in their hands, by way of retainer, or satisfaction, or security, is quite a different consideration. If, then, the case stopped here, the denials of any property of the debtor being clear, and the facts establishing none, but adverse claims and interests, my judgment would at once lead me to pronounce that the supposed trustees are entitled to be discharged.

There is another difficulty in the case, as it is now presented, which forms, in my mind, an insuperable obstacle to the charging of these parties as trustees. Mrs. Swan's will has never yet been admitted to probate; and until that is done, it would seem impracticable to act upon the subject-matter of that instrument. The supposed trustees in this attachment, Harrison G. Otis and William Sullivan, are two of the persons named in that will as trustees and executors of the property devised therein. The other trustee and executor is not even made a party to the present attachment. Messrs. Otis and Sullivan have not yet accepted the trusts, or taken upon themselves the duties of executors. Their only title to assume either, depends upon the validity of that will, as a legal ap-

pointment. And they disclaim having any possession, actual or constructive, of the property, except merely as preparatory to the assumption of their duties under it, when it shall have been duly proved and allowed. Indeed Mr. Otis has never intermeddled, in the slightest manner, with the property since Mrs. Swan's decease; and all his antecedent interests therein, under prior trusts, were devested by other conveyances made in her life-time. Now it is familiarly known, that in this commonwealth our courts of probate have not only a general, but an exclusive jurisdiction over the probate and allowance of all wills, whether they concern real or personal estate. No other court can entertain the question of the validity of a will directly or indirectly, whether it be a court of law or of equity. Until such probate, no notice can be taken of the instrument, by whomsoever made, as a testamentary paper. If rejected or disallowed by the court of probate, as a will, it is incapable of being set up elsewhere. If allowed and approved by such court, the probate is, as to its validity, conclusive upon every other court sitting within this jurisdiction. Sitting in the circuit court here, I have no right to entertain any question upon the matter; but must wait until it has been litigated and decided in the proper forum. If, therefore, all the proper parties were before the court, and all their interests fully represented, it would be impracticable for this court to move on with the cause, until the testamentary instrument of Mrs. Swan had passed the proper probate.

It has been argued at the bar, that this testamentary instrument, being made by a feme covert, is not properly and technically a will, but an appointment in the nature of a will. Be it so. It does not change the posture of the difficulty. If it be an appointment, it purports to be so, as a will; and it must be proved, as a will; and if it wants validity, as a will, it is utterly void. It is a mode of executing the power of appointment provided for by the indentures of the 30th of March and the 25th of April, 1825, and must be proved as it purports, that is, as a will. If it cannot be so proved, then the whole property remains in the persons to whom it was conveyed in trust by those indentures; and neither of the parties to this attachment have any interest or power inchoate or complete over it. Their possession, if it exists at all, is a possession for other persons, and not for themselves, or for Mrs. Swan. Now, the persons named in these indentures, or either of them, are no parties to the present attachment. Surely their rights and interests cannot be precluded by such an ex parte proceeding as the present. It is perfectly clear from the authorities, that testamentary instruments, executed by femes covert for the disposal of their separate property under powers of appointment, are matters, in England, of ecclesiastical jurisdiction, and are to be proved in the ecclesiastical courts, as to

personal property, (over which alone those courts have jurisdiction) before notice can be taken of them elsewhere. This is abundantly shown in the elementary writers and commentators; 1 Madd. Ch. Prac. 372, 373; 1 Thom. Co. Litt. 132, note n; 2 Rop. Husb. & Wife, pp. 191, 192, c. 19, § 3. See, also, 2 Kent, Comm. 143; Ross. v. Ewer, 3 Atk. 160, and was acted on in the very recent cases of Tappenden v. Walsh, 1 Phillim. Ecc. 353, and Temple v. Walker, 3 Phillim. Ecc. 394. The case of Osgood v. Breed, 12 Mass. 525, so far from impugning this doctrine, as to the jurisdiction of our probate courts over testamentary instruments of this nature, proceeds upon the supposition of its existence, and assigns very satisfactory reasons (page 533) why the jurisdiction ought to be exercised, and that it is exclusive, both as to real and personal estate. The non-existence, then, of that probate in the present case, (I repeat it) seems to me a fatal defect, which cannot be cured in this suit, and must defeat the attachment, so far as it seeks to charge the parties as trustees of Mr. Swan.

It has been farther argued, that the parties are at all events chargeable as trustees to the extent of the annuity of 2000 dollars, which, by Mrs. Swan's will, is given to her husband. To this argument various answers have been given, and some, if not all of them, are conclusive against it. In the first place, without a probate of her will, no right to any such legacy can legally attach in him, and her executors cannot be liable therefor, until they have taken upon themselves the execution of the office according to the course of our laws. In the next place, an executor cannot be charged as trustee of any person to whom a legacy is bequeathed by his testator; for such a legacy is not "goods, effects, or credits," within the meaning of our statute of foreign attachments. So was the decision of the supreme court of this state in Barnes v. Treat, 7 Mass. 271. And for a broader reason of public policy, it has been held by the same court in Brooks v. Cook, 8 Mass. 246, that an administrator is not liable to be holden as a trustee of a creditor of the estate of his intestate; for he derives his authority from the law, and is obliged to execute it according to law. In the next place, if an executor might ordinarily be held as trustee of a legatee, it is far from being certain that he could be so in the present case. The bequest is of an annuity of 2,000 dollars, to be paid in semi-annual payments of 1,000 dollars to Mr. Swan, during his life, by the executors. It can scarcely be presumed, that it was not the intention of the testatrix that this should be a personal payment for the personal comfort and maintenance of her husband, and that the annuity itself should be placed beyond the reach of any creditors. To direct a payment to the creditors of Mr. Swan, through the instrumentality of a foreign attachment, would be to defeat the purposes of the will. It would be, in effect, to

declare that the executors should not pay her bounty to her husband; but should pay it to his creditors. If such a course be repugnant to the manifest intention of the will, I do not see how a court of law can intercept the bounty of the testatrix, and give it a new direction. There is an implied trust in the executors to make the payment personal, and to retain the money until so paid. And if so, what court can be at liberty to overthrow it?

But if these difficulties could be, as I think they cannot be, overcome. there remain behind other obstacles of no ordinary magnitude. There is, in the first place, the claim or lien upon the furniture, plate, books, and pictures for the advance of 6,000 dollars. If these things could be deemed in any just sense the property of Mr. Swan, as upon the answers I think they cannot, still they are expressly pledged by him in terms perfectly unequivocal and certain to the persons who have made that advance. The doctrine of the supreme court of this state (as I understand it) is, that property pledged, or under a lien, is not attachable on this process. Badlam v. Tucker, 1 Pick. 389. It has been suggested, that this point has never been directly decided; and that in the case cited it is a mere dictum. It may be so; but it is a dictum from a learned judge in a court where the question must often have been presented for decision; and I consider him as speaking, not so much to the point, as new, but as one perfectly known and settled. But if there were no authority in point, it appears to me, that the result is the same upon principle. In case of a pledge, the pledgee has a special property in the pledge. and is not bound to deliver it up until his incumbrance is discharged. And a creditor surely cannot, in this respect, have greater rights than the pledgor himself. The case of a lien is the same in principle. The party is not bound to take the property as his own, and thus become a purchaser, and account for the surplus value; nor is he bound to deliver it upon execution, unless his lien is discharged. It would be a violation of his rights and contract to hold otherwise. It would be to create a new contract, and not administer upon that which the parties have made. In a general sense. goods, which are not attachable by the common process, are not attachable by this extraordinary process. There may be special exceptions, such as that in Clark v. Brown, 14 Mass. 271, standing on a peculiar ground; but the general principle is, as has been stated. Maine Fire & Marine Ins. Co. v. Weeks. 7 Mass. 438; Perry v. Coates, 9 Mass. 537. And goods in pawn cannot be taken in execution for the debt of the pawner at the common law. Bac. Abr. "Executors." p. 175. c. 4. Badlam v. Tucker, 1 Pick. 389, 400. Then, again, if these things belonged to Mr. Swan. there would be very strong ground to hold upon the circumstances, that there was an implied hypothecation of them, as security for the advances made by Mrs. Swan.

And, if so, a court of equity would fasten it upon the property, and hold in favor of the wife, and her donees. the claim as valid, as if the advances had been made to a stranger out of the separate property. And what a court of equity would hold, ought, in favor of the parties summoned as trustees, to be now held in their favor. It is expressly asserted in the answers, that the advances of Mrs. Swan were not mere bounties to her husband, but were charged as debts against him. In the rear of these claims another lien is asserted against these things, if the property belongs to Mr. Swan. I refer to the claim of Mr. Sullivan for $6000 for professional and other services, a claim. of the justice of which the court, at least, entertains not the slightest doubt. Whether this claim constitutes a lien, or not, upon the property, or may be asserted as a set-off, or is otherwise equitably to be recognized under this particular process, need not at present be decided. The case of Allen v. Megguire, 15 Mass. 490 (see, also, Jarvis v. Rogers, 15 Mass. 389, 406, 414), is against any such lien, or set-off. But there is a very material qualification upon the doctrine of that case in a later one (Hathaway v. Russell. 16 Mass. 473, 476), where the court distinctly held, that the trustee may, in a suit of this nature, avail himself of any claims which he has against his principal, and of which he could avail himself by set-off at the trial, or by a set-off of judgments and executions under our statutes; claims for unliquidated damages. for mere torts only, being excepted. There is good sense, equity, and convenience, in this latter course; but it is not necessary for me, on this occasion, to decide the point; and I cheerfully leave it to those courts, which are more familiarly called upon to consider and settle questions of this nature.

In what has been already said, it will be perceived, that no distinction has been taken between the two iron bedsteads and the other furniture. This is not an accidental, but designed omission. Upon the facts in the case I am unable to distinguish between them and the other articles, as to presumption of title from origin, or use, or possession. An exception has been taken to the refusal of the trustees to answer certain questions asked of them by the plaintiff; and they have put themselves to the court. upon their rights and duty in these particulars. Those questions go altogether to details, which respect the separate property of Mrs. Swan. The trustees have expressly sworn, that they possess no property, which they do not claim as the trust and separate property of Mrs. Swan; and if so, the plaintiff has no right to inquire further, in what manner her separate property has been, from time to time, disposed of. These are res inter alios acta.

Such are the conclusions. to which my mind, upon deliberate consideration. has arrived. upon the various questions raised at this argument. They admit of much more ample

discussion and illustration. But being satisfied, that these conclusions are, so far as my judgment goes, entirely decisive of the case, I have thought it my duty not to keep the parties any longer in suspense, when I am relieved from all doubt. It is for the interest of the plaintiff to know, at as early a period as possible, the result of this litigation, that hope deferred may not make the heart sick. And it is fit also, that the persons sued as trustees should not be held in a state, in which they can take no step, from uncertainty of right or duty. If I had possessed more leisure, I should probably have dealt more elaborately with some of the topics, and enlarged on some distinctions. As it is, nothing further is left, but to pronounce my judgment, that the trustees be discharged with costs. Trustees discharged accordingly.

[NOTE. Subsequently it was held that judgment by default could not be taken against Swan because of want of proper service of process. Case No. 11,134. After this Antonio F. Picquet, as administrator of his father, Jean Claude Picquet, filed his bill in equity against Swan and the other parties, trustees in the case above. Swan, being out of the jurisdiction of the court, refused to appear and answer. The other defendants moved, on this account, that the bill be dismissed. Before granting the motion, the plaintiff was allowed additional time. Id. 11,135. Swan died in 1831, and after his death a judgment at law was obtained against his administrator. Case unreported. Later a motion for a new trial was overruled. Id. 11,131.]