## William Allison et al., Executor of Perrin M. Smith v. Harriet K. Smith et al.

*Probate of Wills: Evidence.* The statutes respecting the probate of wills make no distinction between the different kinds of wills; and all facts bearing upon their execution, whether it involves a gift within the provisions of the Religious Society act, or not, are regularly open to proof on the probate thereof.

A will giving all the property to a college connected with a religious body must be proved once for all as though it were a will executed under the general law.

*Will: Devise: Religious Society.* Under the provisions of the statute—*1 Comp. L.* § *2032*—it is provided that every devise, gift or bequest of real estate, etc., hereafter made by last will or testament shall be void, so far as such devise, etc., shall be or purport to be made * * * for the use of any church, religious society, or for the use of any ecclesiastical or educational institution *connected or to be connected* with any such church, etc., unless such will shall have been duly executed at least two months prior to the death of the estator," etc.

*Held,* That the language "*connected with*" is not to be interpreted as necessarily meaning an organic connection created by charter; but that it includes those cases where the connection is one of fact established by the bodies themselves.

*Heard January 11th.    Decided April 14.*

Error to St. Joseph Circuit.

William Allison and Caleb Ives presented to the Probate Court for the County of St. Joseph an instrument dated June 25, 1864, purporting to be the last will and testament of Perrin M. Smith, deceased, and subscribed in presence of two witnesses; also a codicil thereto attached, bearing date February 3, 1866, subscribed in presence of three witnesses.

After providing for various bequests, all the residue of the estate was given to the trustees of Kalamazoo College, to be held for educational purposes. This provision was contained in both instruments.

The instruments were duly admitted to probate as the last will and codicil of said Perrin M. Smith, and an appeal was taken from the decree of the Probate Court by the heirs of the deceased.

In the Circuit Court an issue was framed for trial by jury. The respondents, who were heirs at law of said Smith, gave notice that they would prove that the Kalamazoo College is an educational institution connected with the Baptist convention, that said convention is a religious corporation and society of Michigan, and that said college was under the control of said corporation; that said pretended will and codicil were not duly executed and deposited with the Judge of Probate of St. Joseph county, and was not filed in the office of said Judge of Probate, and did not remain there without alteration or codicil for at least two months prior to the death of said Smith. And that said devise exceeded the sum of one hundred dollars

Under the charge of the court the jury rendered a verdict that said instrument propounded as the last will and testament of said Perrin M. Smith and the codicil thereto were such will and testament, except in so far as they devised property to said Kalamazoo College.

*D. Darwin Hughes*, for plaintiff in error.

1. The question as to whether the Kalamazoo College can take, under the will, is a question of distribution of the estate, and not of execution of the will, and it can not be made in the Circuit Court on appeal from a decree allowing the will, but only on appeal from the decree of distribution.

*a.* The college is not a party, and can not regularly be heard on the probate of the will.

ALLISON ET AL. *v.* SMITH ET AL.

In this respect our laws differ from those of New York. 1 *Brad.* 435; *Comp. Laws,* § 2841; 2 *Redfield on Wills, p.* 4, § 3.    But it is a party to the hearing for distribution, and the question as to who are entitled' to the estate must then be determined.—*Comp. L.* § 2992.   Any interested person may apply for the decree.—*Id.* 2097.    And all parties must have notice.—*Id.* 2996.

2.  As a question of execution, it is entirely abstract, as it can not appear on the probate of the will whether the college will ever claim under the will, or whether there will be anything left for it as residuary legatee.

3.  It is against the policy of the law that the Circuit Court should direct the Probate Court, except by appeal from its decrees.    And when the Probate Court comes to make distribution of the estate, it must then decide who are by law entitled, and it must decide as having original jurisdiction of the question.

4.  It can not be determined on the probate of the will whether the gift of the College amounts to $100; it being the residuary legatee.

It is not easy to see how the value of the residuary interest can be determined without some proof of the debts and liabilities, and in this respect the court erred in its refusals so to charge the jury.—*Laws* 1859, 449; *Laws* 1861, 240.

5.  The question is outside the issue.  Proponents allege a general execution, and no other, and their allegation does not bring them within the religious society act.  The notice under contestants' plea, neither denies or avoids any allegation of the proponents, so that the special execution is not in the issue, as it is not claimed or alleged by proponents; and the only question is as to the character and capacity of the college, which is a question of distribution.

6.  It is a question of distribution upon authority.—3 *Pick.* 232; 9 *Cow.* 437; 3 *Sandf.* 351; 14 *N. Y.* 380; 29 *Barb.* 650; 2 *Comp. L.* 2009, §§ 2825.

ALLISON ET AL. *v.* SMITH ET AL.

The proof of a will has always been confined to the death of the testator, his soundness of mind, age, and the statutory requisites of execution; and the only question under this issue was, whether the will was sufficient under the general law of wills.— *Comp. L.* § 2829.

If a special execution had been alleged, the question might be different, because then the incapacity of the college to take under a general execution would have been admitted; but in this case the pleadings admit there is no special execution, and deny the incapacity of the college, which denial of incapacity is a question of distribution.

The question has been treated as one of distribution by this court.— 13 *Mich.* 44.

The question has been distinctly decided in Massachusetts.— 9 *Pick.* 350.

It is not denied that there may be a limited probate of a will, but in such cases the court never go beyond the strict question of execution: as if a portion of the will has been forged, or was inserted without the knowledge of the testator, or when the will is so executed as not to pass all kinds of property; but on proving the will the courts never look to the validity of its devises, or the capacity of the devisees to take under it. These are questions of distribution.— 1 *Pick.* 239.

The cases of partial probate cited, are all of this character.— 2 *Redfield on Wills*, 43.

If the question is one of execution, and properly raised on the proof of the will, then the probate of the will is conclusive on the question, and it could never arise as a question of distribution, as in the *Ticknor* case.— 8 *N. H.* 126; 16 *Mass.* 441; 1 *Pick.* 535.

7. Assuming the question to be properly treated as one of execution, then the court erred in admitting improper evidence to show that the college was connected with, under the control of, and subject to the visitorial power of the Baptist convention.

It erred in failing and refusing to instruct the jury as to what was meant by connection with the convention, as requested by proponent's counsel.

It allowed contestants to show the proceedings of the college trustees for this purpose.

In this there was manifest error.

The Kalamazoo College was first incorporated April 22, 1833, under the name of the "Michigan and Huron Institute," by an act which made certain persons its trustees, and directed and empowered them to establish a Literary Institute, "to promote the knowledge of all those branches of education usually taught in academic and collegiate institutions, and to acquire property by donation, gift, grant or otherwise."

Various amendments recognize its educational character.

The college was created, as these acts show, for purely educational purposes; authorized to receive gifts and donations, and declared to be free from all religious tests and denominations, and subject only to legislative visitation.

It could not legally place itself under the visitorial power or control, or in connection with any church. It would be an act unauthorized by its charter and void; and it would be restrained within the proper scope of its powers by the courts.

The Baptist convention, it is not denied, is a religious corporation.

The question in the court below was, whether the college was under the control of, or connected with, the Baptist convention, within the meaning of the statute.—*Comp. L.* § 2032.

The intention of the Legislature in making the disabling act of 1867 as applicable to this case was manifestly to control the acquisition and disposition of property by religious societies.

It is conceded that the college is not a religious society; but the act disables it if it is connected with a religious institution; but how connected? We answer—

So connected, as that the convention should have the right to interfere with the property devised — its acquisition or disposition.

As a matter of law, we say the convention, however the college may have been connected with it, could have no interest in, or power of control over, the money granted by this devise; and the case can not and does not come within the scope of the act; and the connection meant by the act must be held to be legal, binding connection; such as gives to the religious society some legal control over the property of the college.

The act is a' property act — and the connection and control meant is a property connection and control, such as gives to the church a legally vested right in the property of the college.

The words, "under the control or direction of," to make any sense, must mean binding and legal control or direction. To say that one has the control of a thing which is entirely beyond his power, is nonsense.

And we submit that the words, "connected or to be connected with," are used in the same manner to denote binding, organic, legal connection.

The entire evidence shows that the two bodies were separate and independent legal entities.

But, it may be said that the connection, control, or visitorial power mentioned in the statute, may exist between unincorporated bodies, which have no charter by which the connection may be shown.

The answer is, that connection between unincorporated bodies must and may be shown by other evidence: The articles of association; the by-laws; and if these are consistent with the connection, then the proceedings. But here we have a charter, granting certain powers for certain purposes. Those powers and those purposes can not be enlarged, except by law.

*H. F. Severens,* for defendant in error.

The case presents two points:

*First.* Is the question of the connection of the Kalamazoo College with the Religious Society of Baptists, one relating to the subject of the execution of the will, and to be inquired into on the probate; or, is it a question of capacity in the college to take and to be inquired into upon making an order of distribution in the probate court, upon the settlement of the estate?

*Second.* Upon the interpretation of the statute — *Comp. L.* § 2032 — is the language, *"connected with,"* etc., to be interpreted as meaning only an organic connection created by the law of incorporation; or does it also include those cases where the connection is one of fact established by the bodies themselves?

1. The statute manifestly makes it a question of execution. It superadds to the ordinary requirements to be observed in the execution of wills, certain other formalities intended to guard more effectually against impositions practiced upon persons in their last sickness, in securing benefits to ecclesiastical objects to the disinheriting of the heir.

If the formalities required by statute are complied with, the question of capacity to take never arises.

The Kalamazoo College undoubtedly has the capacity to take whatever is conveyed to it by the requisite formalities. So under the general statute of wills, the capacity of any person to take would arise in the same way. The special formalities required in this case can not produce any different result, or require any other mode of adjudication, from that obtaining under the general statute. The question is one which relates to the execution, and could not, if the will had been established by probate, be raised at all upon the distribution. For the distribution takes place according to the will, and after its establishment the court could not go back on its former adjudication and inquire anew as to

whether it had been duly executed so as to be effectual in whole or in part.— 2 *Redf. on Wills*, 55 *par.* 9 *and note* 39; *Id.* 53 *par.* 6 *and note* 29.

*a.* Upon the probate of the will all persons interested are parties, and the decree establishing the will or disallowing it, is conclusive as against all persons and in all courts. Such decree establishes that the formalities of execution of the will have been complied with, and that the instrument is valid and effectual for what it purports to do, so far as a will is capable of so doing.— 2 *Redfield, ubi supra*; 2 *Smith Lead. Cas.* 692; 20 *Vermont*, 65.

*b.* A will may be established in part, and disallowed as to a part. The court will establish such part of the will as speaks the will of the testator, so far as the law sanctions his mode of disposing of his property, and will lop off the defective portion, and that only.— 1 *Redf. on Wills* (*first ed.*), 519 *and note* 25, *and* 181 *and note* 48; 2 *Id.* 43; 1 *Williams on Exec.* 330; 10 *Mich.* 341; 13 *Id.* 44.

2. The statute is not to be interpreted to mean that the literary institution is to be "connected with," etc., the religious society by actual incorporation, so that the connection shall be shown by the terms of the charter, and declared by the court on inspection thereof. Such connection may be shown to exist. It is a matter of fact, and may be shown by the action of the bodies themselves.

*a.* It imposes a technical restriction upon the meaning of words not technical, instead of their obvious and natural import, taken in their popular signification.— 20 *Wend.* 561; 2 *Mich.* 268; 1 *Kent Com.* 462; 11 *N. Y.* 601; *Sedgwick on Stat. Law*, 260.

The proposed construction would require the interpolation of the words "by the terms of its incorporation," or something of equivalent import before the words "connected with." This would be a great reproach to the law.—3 *Q. B.* 910; 12 *A. and E.* 468.

*b.* It violates another established maxim in the construction of statutes, in that it disregards the consideration of

the mischief felt and the remedy sought, in seeking for the intent.

*c.* Such a construction must render the statute a dead letter; for it is not believed that the Legislature of this state has ever fixed in the charter of a literary institution a legal connection with any religious body, or put it under the control of such a body. Such legislation would be contrary to the general policy of the state; if not in contempt of the plainly expressed sense of the framers of the Constitution. See *Art.* 4, §§ 39, 40, 41.

*d.* To impute such an intention to the Legislature, is to suppose that they passed an act susceptible of the easiest evasion. If a religious body wished their protegé to be relieved of such a disadvantage, all that was necessary, according to the argument for the college, is that the charter should omit the connection.

*e.* The rule contended for would make it necessary that the college should be by law placed under the power of the society, in such a way that the college could not, by law, relieve itself. This would give the words "connected with" or "under the direction of," no force. The expression of such an intent would be fully made by the words "control of," and the other language used. This would violate the rule "that every clause and word of a statute shall be presumed to have been intended to have some force and effect." 2 *Mich.* 469; 5 *Id.* 114, 260; 2 *Hurls and Colt,* 571 – 2; 9 *Gray,* 296.

GRAVES J.

Although the fact is not stated on the record, it is to be inferred that soon after the death of Judge Smith proceedings in the usual form were had in the Probate Court for the proof and allowance of the will and for letters testamentary thereon, and that a decision was made in the premises in that court. The record denotes that the defendants in error appealed from that decision to the Circuit

Court, and that therein, and by direction thereof, the formal allegations and answer now before us were made. The case was tried before a jury, who returned a verdict sustaining the will, except in so far as it assumed to give property to the Kalamazoo College, and, as to that finding, against it. Several exceptions were taken by the plaintiffs in error to decisions of the court, touching the admission of evidence, and upon refusals to charge as requested, and to the charge as given; and such exceptions present the questions to be decided on this writ of error. They are quite numerous, but all which are deemed material, may be considered under the following heads: *First:* Was it competent for the defendants in error, the contestants below, under the objections of the plaintiffs in error, the proponents below, to give evidence to prove that the college was connected with the Baptist Convention? *Second:* Of what nature must the connection have been to have rendered necessary the formalities prescribed by the religious society act? *Third:* Was the case rightly given to the jury? Upon the argument the counsel for proponents contended that the first question must receive a negative answer, and supported that view by the following propositions in the order here stated. The question as to whether the college could take under the will was one of distribution of the estate, and not of execution of the will; because, *first,* the college was not a party, and could not regularly be heard on the probate of the will; but would be a party to the hearing for distribution; *second:* That as a question of execution it was entirely abstract, as it could not appear on probate whether the college would ever claim under the will, or whether there would be anything left for it as residuary legatee; *third:* That it was against the policy of the law for the Circuit Court to direct the Probate Court, except on appeal from its decree; and that the latter court when proceeding to make distribution would be obliged to decide as an original proposition, and on the footing of its original jurisdiction, all questions of distribution, and among them who

were by law entitled; *fourth:* That it could not be determined on the probate whether the gift to the college amounted to $100, as the legacy was residuary; *fifth:* That the question of connection between the college and convention was outside of the issue, as proponents had alleged a general execution only; and *sixth,* That the proof of a will has always been confined to the death of the testator, his soundness of mind, age, and the statutory requisites of execution, and involving only the question of the sufficiency of the will under the general law. These questions are of such a nature and so associated and related, that a clear discussion of them all will render repetition to some extent unavoidable. The objection on behalf of proponents that the college was not a party, and could not regularly be heard on the probate in consequence, involves the assertion that they did not represent the college and could not speak for it; and when considered in presence of the fact that this objection was made to resist an attempt by contestants to go into proof of execution under the religious society act, and was joined with an explanation by proponents that they denied the incapacity of the college, and alleged that the latter had no power to *connect itself in fact* with the convention, there would seem to be an occasion for applying the maxim, that "he is not to be heard who alleges things contradictory to each other."

This objection may, however, receive a more complete answer; but as much of the reasoning applicable to it, and also to the objection that the particular inquiry was beside the issue, will have a common bearing upon both, the two objections will be considered together.

Proceedings belonging to probate and administration are not, in the strict sense, suits or actions. They are of a mixed character and susceptible of institution and management upon altogether different principles than such as govern at common law. They may be promoted by those having no pecuniary interest, or by persons on whom the

law, on account of the circumstances, shall have cast the duty; or they may, in particular instances, be initiated by the court. They partake of the character of proceedings *in rem*, and are often governed by the same principles. They may and often do bind persons *not named* on the record.

In the propounding a will for probate, the rights of *"all concerned or interested"* are involved — whoever are named as proponents; and since the propounding does in general, as in this case, impose on the proponents some of the moral duties peculiar to a trust, it ought not to be expounded on the principles governing cases where the *named parties* are understood to represent themselves *only*, and hence are considered as possessing the right to enlarge or abridge the issue by waiver and admissions to any extent permitted by the court. The issue upon the probate of a will is in a measure marked out by the statute, and can not be contracted to the detriment of those *"concerned or interested,"* and against their remonstrance, by the act of others who happen to be proponents. In the present case, the object of the inquiry below was to ascertain judicially whether the instruments propounded for probate ought to be allowed or disallowed wholly or in part, as the last will of the decedent; and specific allegations could only have been called for or intended to facilitate that inquiry. Such being the case, the allegations were but means to an end already well defined, and could not have been permitted to defeat it. *Baptist Missionary Union v. Peck,* 9 *Mich.* 445; *In the matter of Robinson,* 6 *Id.* 137, 143; *Trinity Church v. Hall,* 22 *Conn.* 125, 133.

It was not a proceeding of *party against party*, but one intended to pass upon the testamentary qualities of the papers exhibited for probate, and to ascertain and adjudge the *"status"* of the estate. Being substantially one, *in rem*, it would be conclusive against all the world while unrevoked. The same rule would apply as in case of a sentence in the admiralty, and in respect to which Lord *Mansfield* is reported to have said, "All the world are parties to

a sentence of a court of admiralty." *Allen v. Dundas,* 3 *T. R.* 125; *Bernardi v. Motteux, Doug.* 581; *Tompkins v. Tompkins,* 1 *Story R.* 547, 553; *Ennis v. Smith,* 14 *How.* 400, 430; *Stebbins v. Lathrop,* 4 *Pick.* 33; *Canaan v. Greenwood, T. P. C.* 1 *Conn.* 7; *In the matter of John Mason,* 2 *Bradf. S. R.* 325, 329, 330; *Pritchard v. Hicks,* 1 *Paige,* 270; *Muir v. Trustees of Leake and Watts Orphan House,* 3 *Barb. Ch. R.* 477; *McPherson v. Cunliff,* 11 *Sergt. and Rawle,* 433, 437; *President of Orphans' Court v. Groff,* 14 *Sergt. and Rawle,* 181; *Valsain v. Cloutier,* 3 *La. R.* 170, 175, 176; *Bogardus v. Clark,* 4 *Paige,* 623. It is well settled that the rule which declares that a transaction between two contending parties ought not to bind the interests of a third, has no application to those cases where the object of the litigation is to ascertain and settle the state or condition of the subject matter, as distinguished from the pecuniary rights or liabilities of confronting and contending litigants.

The view here taken assumes that the notice required by law was duly given; and that it was so, has been in effect conceded.

These and other considerations will suffice to show that neither the objection founded on the form of proponents' allegations, nor .that on the ground that the college was not *named* as a party, can be maintained on principle or authority.

The second and fourth points may be considered together. They maintain that the question whether the college could take under the will was entirely abstract, as it could not appear on probate whether the college would ever claim under the will, or whether there would be any thing left for it; and that it could not be determined on probate whether the gift to the college amounted to one hundred dollars.

As the position taken by proponents is supported only by the particular reasons set forth, it is expedient to consider the validity of those reasons; but as nearly all the

points relied on to sustain such position bear on each other, or stand on similar reasoning, the observations directed to this and other heads will be found to illustrate and enforce other portions of this opinion, than· those with which they are immediately connected.

If the grounds suggested for not going into full proof in this case are to be considered as sufficient, it is not perceived why they would not be adequate to exclude a common will from probate altogether; since, in the latter case, it would not appear on ·the probate any more than in the former, whether or not the named beneficiaries would accept, or whether there would be any thing left for them. Whether there was an express acceptance, could not be the subject of inquiry on the probate of a common will, and on such probate it could not. be known in a legal sense whether any thing would be left for bounty after payment of debts and expenses.    As, however, in probate, as well as in other legal proceedings, there must be a settled progression consisting of successive steps, having some definite and logical relation and order, it will follow that each step will naturally suggest its own position, and declare its own end and purpose; and that no one step, if in its proper place in the chain of proceeding and complete in itself, can be objected to on the bare ground that it .involves something which ought to ·have come before, or ought to come thereafter, or depends on some contingency to be thereafter determined. The law which imbues and governs the course, having necessitated the doing of the particular thing, when, in the order of the proceeding, it is done, there can be no objection based on a supposed disregard of such regulated order of proceeding.

Now, according to the established method of proceeding in will cases, the subject of probate must *be exhausted* before the subject of *distribution* is or can be reached; and an observance of this course is obviously necessary, even though it involves to some extent the consideration of the same

matter more than once. Full proof of the will, at the exact time in the order of proceeding for making that proof, could not, therefore, be objected to on the grounds stated.

If to make full proof on the subject of the execution of the will it becomes necessary to go into the question of value or amount of the gift, the requisition of the end will authorize the means; and the implication, that no proof as to the formalities of execution, can be admissible faster than the matter of the will is shown imperatively to require, must be wholly rejected.

The objection that it had not appeared that the college would ever claim under the will, is worthy of some further thought in this connection. The gift to the college as it stands upon the will, is absolute and unfettered. The fact that it is *expressly* given as a residue while it is yet unknown that anything will be left, can not change the principle. In *every* case of gift by will, there must be the unexpressed condition precedent to the practical operation of it, that the means to meet it, and which would be legally applicable thereto, are found and subjected. The gift on paper always takes for granted the existence of all conditions requisite to fulfill its requirements, and is not an executed gift until these conditions are complete.

Some facts are such, that they are always reputed to be true, till the contrary has been proved. Accordingly, it is presumed that every one acts according to his own interest; and that a person has adopted or accepted an advantageous gift, until a positive disclaimer or refusal is shown.

"As the same presumptions are raised in favor of a corporation as of a natural person, its assent to it, and acceptance of grants and deeds beneficial to it may be implied, as in case of an individual."—*Angell and Ames on Corp. chap.* 5, § 173; and "at this day in England, and certainly in this country, the acceptance by a corporation of a grant or devise, beneficial to it, may as well be presumed, as in favor of an individual."—*Id.* § 176.

In *Ex parte Fuller*, 2 *Story's R.* 327, Judge *Story* used this language: "As to the other point, there is no doubt that the devisee must consent, otherwise the title does not vest in him. But where the estate is devised absolutely and without any trust or incumbrance, the law will presume it to be accepted by the devisee, because it is for his benefit; and some solemn, notorious act is required, to establish his renunciation or disclaimer of it. Until that is done, *stabit presumptio pro veritate.* That is sufficiently shown by the case of *Towson v. Tickell*, 3 *B. and Ald.* 31, cited at the bar, and the still later cases of *Smyth v. Smyth*, 6 *B. and Cress.* 112; *Brown v. Wood*, 17 *Mass.* 68, *and Ward v. Fuller*, 15 *Pick.* 185, manifestly proceeded upon the same foundation. Now in the present case, there is no pretense to say that Ross (the devisee) has ever renounced or disclaimed the estate devised to him. The statement of facts is, that he has done no act accepting or declining the devise. If so, then the presumption of law is that he has by implication accepted it, since it gives him an unconditional fee." See in addition to the authorities cited by Judge *Story*, the following: *Bailey v. Culverwell*, 8 *B. and Cress.* 448; *Nicloson v. Wordsworth*, 2 *Swanst.* 367, 372; *Adams v. Taunton*, 5 *Mad.* 435; *Doe ex dem. Marston v. Butler*, 3 *Wend.* 149; *Camp v. Camp*, 5 *Conn.* 291; *Merrill v. Emery*, 10 *Pick.* 507, 510.

Since, then, upon the face of the transaction, the gift would appear to have been for the interest of the college; and since it does not appear to have been rejected or disclaimed, no objection, having for its foundation only the absence of an express acceptance of it, can be supported.

Besides, what has been already stated, and what will hereafter appear, as to the allowable range of inquiry on the probate of a will, it seems appropriate at this stage of the discussion to make some observations chiefly confined to the sixth point made by proponents. That point suggests that the proof of a will has always been confined to the

death of the testator, his soundness of mind, age, and the statutory requisites of execution, and that the only question has been, whether the will was sufficient under the general law of wills.

Now, it has been distinctly held in Massachusetts, New Hampshire and Connecticut, and it is believed in other states, that upon probate of the will of a married woman, the question of the right to make the will in the particular instance was a proper subject for inquiry and decision.— *Parker v. Parker,* 11 *Cush.* (*Mass.*) 519; *Cutler v. Butler,* 5 *Foster,* 343; *Judson v. Lake,* 3 *Day,* 318.

In *Cassels adm. of Cassels v. Vernon, executor of Brown, and another,* 5 *Mason,* 332, which was a case in equity for an account, Judge *Story* considered the same question.

The bill was filed by Cassels as administrator, with the will annexed of his late wife Jane Cassels, against the defendant as executor of Brown for an account and decree of payment of a trust fund belonging to her estate, entrusted during her life time to defendant's testator for her use.

She died in England, and her will was proved in the Prerogative Court of Canterbury, and administration thereon granted to the complainant in 1828, and he subsequently presented the same to the Probate Court of Rhode Island, by which administration was granted to him in like manner. The will of Mrs. Cassels purported to have been made in virtue of a power reserved to her by a bond executed by the complainant before her marriage. The defendant, upon the hearing, which was upon bill, answer, exhibits, and admissions of parties, insisted that complainant was bound to establish all the material facts asserted in the bill in order to found a decree: That he must show that there was a marriage, that the wife had authority to make the will, and that there had been a sufficient probate of the will to entitle the complainant to sue. To this, Judge *Slory,* in deciding the case, answered: "I agree that all these facts are in some sort before the court, and require proof." "But

my opinion also is, that they are sufficiently ·proved by the proper legal evidence. The courts of probate of Rhode Island have exclusive jurisdiction to grant administration upon the estates of deceased persons within the state, and for this purpose to allow probates of the wills of persons dying testate abroad, as well as at home. The jurisdiction applies as well to the wills of married women, as of those who are sole. This point has been already disposed of in the case of *Picquet v. Swan,* 4 *Mason,* 443, 461, 462.

If the jurisdiction attaches, all the incidents attach, and among others the incidental right of inquiry whether the person was at the time competent to make the will. The decision of the Probate Court, being a court not only of competent, but exclusive jurisdiction, establishing the will and granting administration with the will annexed, is conclusive upon the very point now in controversy, and can not be gainsaid." See, also, *Goldsworthy v. Crossley,* 4 *Hare,* 140.

The point of these decisions is, that there may be inquisitions on the probate, which are *merely incidental* to the main inquiry, but which, when they arise, are as much required and are as fully authorized as any other. In the, cases cited, the *incidental* inquiry had reference to the *power* of the testatrix and her observance of the required formalities. The principle must be the same in all cases in which complete proof touching execution would be either ineffectual, or could not be made without such inquiry.— *Nelson v. McGiffert,* 3 *Barb. C. R.* 158, 164.

It is not necessary in this case to consider whether upon the preliminary hearing for distribution any question as to the capacity of the testator, the formalities attending the will, or the validity of the latter as depending upon any thing connected with the making or authenticating of it, could properly be considered; since our present inquiry goes no farther than to ascertain whether it was competent for contestants to produce proof on these topics on *the probate.* The Supreme Court of Connecticut have lately held that

such questions could not be considered on the hearing, *preliminary* to distribution.—*Dickinson v. Hayes*, 31 *Conn.* 417, 426, 427. That every circumstance directly belonging to the *formality* of execution, whether of an ordinary will, or of one by a married woman under the general law, or of one containing a gift to an institution of learning within the provisions of the religious society act, is the regular subject of inquiry on the probate, is a proposition requiring no support. The very object of the probate is to dispose of all questions of execution, and ascertain whether the instrument propounded as the last will of the decedent is such last will, and whether the case is wholly or in part one of intestacy or not. Sometimes the question of revocation by a later will or otherwise is necessarily involved. The case of *Nelson v. McGiffert* already cited, was of that kind. It was an appeal from a surrogate's decree on probate. McGiffert, the executor, named in a will made in 1832, propounded it for probate. The heirs and next of kin were permitted by the surrogate, against the objection of proponent, to prove the making of another will in 1837, *in order to establish the revocation* of *the first*. The second will was not produced. The opinion of Chancellor *Walworth* is authority upon the extent of the inquiry open to the heirs and next of kin in resisting probate; and to mark the distinction between the right to use the same evidence to *establish the second will as a testamentary disposition* on the one hand, and the right to use it to prove the *revocation* of the *first* will on the other. Upon this part of the case the chancellor said: "There is no doubt as to the jurisdiction and power of the surrogate to receive proof that the will of 1832 was revoked by a subsequent will of the testator, and that such subsequent will had been fraudulently destroyed, or that it was destroyed by the testator when his mind had become so impaired that he was incompetent to perform a testamentary act. The chancellor alone had the power to take proof of such a will for the purpose

of establishing it as a testamentary disposition of the property of the decedent. But in resisting the probate of the instrument propounded by McGiffert as the last will and testament of the decedent, the heirs and next of kin had the right to introduce any testimony which would be sufficient to satisfy the surrogate that the instrument propounded was not in force as a valid will at the death of the testator named therein." On turning to the statute — *Comp. L.* §§ 2032, 2033 — it seems evident that the facts as to whether the will has remained two months on file before the testator's death without alteration or codicil; whether the amount attempted to be given was one hundred dollars; whether it was read and understood, and whether it was executed at its date, are facts *directly* belonging to the formalities of execution. They would be inherently the subject of inquiry on probate, and could not be rightly excluded. By the theory of proponents, however, these circumstances, as pertaining to a will under the religious society act, and not needful for one under the general law, should be rejected on the probate as impertinent, and reserved for the hearing, for distribution. It often happens that the same evidence is pertinent to different and successive heads of inquiry in respect to the same matter or in the same proceeding. In such instances it becomes proper evidence on the first head which is reached, for the purpose of proof on that head alone; and any objection, having for its ground the relevancy of the evidence to a head not then reached, will be promptly and properly overruled. A familiar instance of the employment of the same evidence on different subjects in the same case, occurs in proving the loss of a document to let in parol proof of its contents. Regularly, all proof of the contents would be inadmissible to prove what the instrument itself, if introduced, would have shown. But as proof of the loss would necessarily involve some proof of the document itself in order to identify it, so much proof of the contents as would be necessary for the latter purpose

would be admissible. Such proof, however, in the case supposed would belong strictly to the asserted loss, and have no other application. If in the case before us the particular proof was required on the probate, its admissibility on hearing, preliminary to distribution, would make no difference.

When in contemplation of law it is uncertain whether the formalities specially prescribed are requisite to the validity of the gift; and when such *uncertainty* can only be removed by the determination of the Probate Court as to the character or constitution of the donee, it must be not only regular, but necessary, that the inquiry as to execution, as being earlier in the course of proceeding than the hearing for distribution, and a basis for it, and as involving all facts and formalities needful to a valid execution and gift, should include the incidental right to inquire into the character or constitution of the donee so far as necessary to make the primary and principal inquisition efficient.

In no other way can the question of "*due*" execution be exhausted when that question is regularly reached and involved in the petition for letters testamentary; and any practice founded on a supposed necessity for alternating on questions respecting execution between the hearing for probate and that for distribution, must be highly embarrassing and inconvenient if not altogether erroneous.

What remains to be stated on this branch of the case will be designed to bear upon all the points which have been examined, and on the general proposition of proponents that proof of connection between the college and convention would be admissible *only* on the hearing for distribution; and will be likewise designed to show that the course insisted on by proponents would be inconsistent with the purpose of the statute in probate cases. An examination and comparison of some of the statutes respecting wills and the settlement of estates will shed light upon the subject we are considering.

16 MICH. — 2o.

No will can be effectual to pass either real or personal estate *unless duly proved and allowed;* and such probate when made will be conclusive of *due execution* — § 2844, *Comp. L.* *All* estate not *disposed* of by the will must be administered as intestate estate — § 2828. If the will was deposited with the judge, he must open it at the first court after notice of the testator's death, and must give the requi-site notice of its existence and custody — §§ 2834, 2835, 2836. If it was left in other hands, the keeper of it must deliver it to the Probate Court or to the named executor in thirty days after such keeper has knowledge of the death of the testator — § 2837.

The person named as executor must, in thirty days after the testator's death, or within thirty days after he ascertains that he is named as executor, if that is learned after the death of the testator, present the will to the Probate Court having jurisdiction, unless it was otherwise deposited with the judge, and within the foregoing period signify his acceptance or refusal of the trust. — § 2838. When the will is delivered in, or deposited in a Probate Court having jurisdiction, the court must appoint a time and place for *proving it, when all concerned may appear* and *contest* the *proving it.* — § 2841. *All* the estate is made liable for *debts.* § 2853. If the provision made by the will, or the estate appropriated, is insufficient to pay the debts and expenses of family and of administration, then such part of the estate as shall not have been disposed of by the will, if any, is to be resorted to for the purpose. — § 2855. When the will is duly proved and allowed, letters are to be issued and the requisite security taken. The executor within three months must make a true and perfect inventory of all the goods, chattels, rights, credits and estate of which he has knowledge; and he is required to administer according to law, and to the will, all the property of the estate. — *Chap.* 93, *Comp. L.* As to the course of proceeding to be adopted to administer as in case of "intestate estate," and which is

expressly made necessary by section 2828, whenever there is a will which does not dispose of all of the property, nothing more need be said than that it is wholly different from and inconsistent with the course required when the property passes by the will. This will be apparent by examination of the two methods. See *Chap.* 94, *Comp. L.*

As our statutes relating to wills, probate and administration, were borrowed from New England, and are very similar to those of Massachusetts, the foregoing reference to them may be appropriately followed by the following citation from the opinion of Chief Justice *Shaw*, in *Crippen v. Dexter*, 13 *Gray*, 330. " The importance," says the Chief Justice, " of making proof of a will, *once for all and for all purposes*, must be obvious. It determines the *status*, if it may be so called; the condition of a deceased person's estate. It must be settled as an estate testate or intestate. The establishment of the one necessarily excludes the other. The modes of administration are so distinct from the commencement to the termination, operating upon the same property real and personal, administering the same assets, that it is impossible that an estate should be settled partly by an executor under a will, and partly by an administrator under an intestacy.

The same principle is acted on by the English law, with the exception of devises of real estate, which are regarded as a species of conveyance, because real estate is in no respect under the jurisdiction of the ecclesiastical court which has the exclusive jurisdiction of the probate of wills and the settlement of estates. But it is otherwise in Massachusetts."

As section 2828, already cited, provides that all property not disposed of by the will must be " *administered as intestate estate;*" and section 2855, provides that all that part of the estate, if any, not disposed of by the will, shall be *first* resorted to for the payment of debts and expenses of the family and of administration, if the provision made by the

will, or the estate appropriated for the purpose, is insufficient; and as section 2844 provides that no will shall be effectual to pass either real or personal estate unless it shall have been duly proved and allowed, it is not perceived how it is to be ascertained whether the particular property is disposed of by the will or not, so as to satisfy these requisites and the exigencies of administration, unless it is ascertained on the probate whether the instrument propounded as a will is sufficient to pass the property. It is certain that the "status" of the property embraced by the reputed will would be involved in great doubt until the sufficiency of the latter should be definitely settled; and in the meantime it would be impossible in a legal sense to determine whether as to such property the estate was "testate" or "intestate."

The theory indicated by proponents, however, would seem to imply, that the question whether the particular will had the requisite formalities to pass the property under the religious society act, should remain in abeyance until the estate should be so far administered or settled under their executorship as to be ready for distribution — that is to say, until a stage should be reached in the settlement of the estate, which, regularly, could never be reached until the very question made by proponents to contingently depend upon it, should have been first determined. See *Goldsworthy v. Crossley,* before cited.

The probate, as a step in the proceeding, is clearly distinguishable from that for distribution. The first should be *completed* before the last is *commenced.* This is necessary, though the completion of the first step should involve an inquiry which would also be admissable upon the last. If, to know what kind or degree of proof would be necessary to make the probate hearing complete, it should be indispensable to ascertain another fact, as, for example, the character of the donee or its relation to another body, the latter fact would become a circumstance belonging to the question of execution, and as essential as any other. The object of

the inquiry and the point to be established or overthrown would ascertain the necessity and fix the character of the proof.

As a question of distribution, the ability of the donee to take would in no wise be involved. It would be as belonging to the question of execution only, that proof would be received respecting the relations of the donee to another body, and it is to be remembered that we are not dealing with any question of distribution on this writ of error, but only with questions growing out of the hearing on probate.

Whenever the paper propounded as a will has been subjected to every kind and degree of proof on probate which could be necessary according to its provisions, and been regularly adjudicated upon, its character as a testamentary instrument is fixed; whatever construction should be subsequently put upon its provisions, and whatever decision should be thereafter made upon the capacity of any donee to take. Until the requisite adjudication upon probate, the instrument, in so far as such adjudication should be wanting, would remain incomplete as an adjudged testamentary paper, and without any fixed legal value as a will. In so far as it should remain unproved, it could not have the full operation of a will. The fact of its being unproved, would not render it void.

But it could not be told whether it was void or not, until it should have passed the ordeal of probate.

If, upon being subjected on probate to every test possibly needful, in view of its nature and provisions, it should be allowed, it would then be fully operative as a will, and retroactively from the death of testator. If disallowed, wholly or in part, it would be void so far as disallowed. See *Ex parte Fuller*, before cited.

Whether the will in its formalities is valid or invalid as to a particular gift, can not be determined by assumption, but only on submission to and decision by the court. It can take no impression in this respect from the testator's heirs, or from the objects of his trust or bounty.

The estate can not be transformed into "testate" or "intestate" property by those named as executors, trustees, or beneficiaries; nor can the election of the latter to treat it in a particular manner for administration, in any degree change its nature. There is no statute which authorizes the exhibition of a will for probate by instalments. The law provides for proving it, and allows all concerned to contest the proving it. It does not say that there may be probate of one part at one time, and of another part thereafter; nor, when susceptible of two degrees of proof, that it may be submitted to probate for the first degree at one time, and for the second after the estate is partly administered. The view of proponents is, however, that the kind of probate essential under the religious society act, is to be deferred until the hearing for distribution is reached, when, if such proof is found to be necessary, it is to be made, if possible. It is believed that the statute respecting probate makes no distinction between one kind of wills and another, as to the time for proving execution; and that a will giving all the property to a college allied, but in fact only, to a religious body, would have to be fully proved "once for all," as surely as one falling wholly under the general law.

It certainly can not be maintained that the custodian of the will, or the person named in it as executor, or any one propounding it for probate, can practically exclude it from the kind of probate required for a will disposing of property to a religious body, when, according to its provisions, it might or might not be subject to that kind of probate; and it will be admitted that it can not in such case be kept by those so concerned with it, from all kind of proof. If it were competent for the named executor, or party propounding the will for probate to restrict the proof in the first case to probate under the general law, no reason is seen why the same party could not withhold the will from proof altogether.

The proceedings in testamentary cases have always been considered as summary.— 2 *Chitty Gen. Prac.* 504. And our

probate system shows very, clearly that expedition in the settlement of estates is one of its leading objects. It was so declared by this court in *Holbrook v. Cook*, 5 *Mich.* 225 - 230, in these words: "The great desideratum in proceedings in probate cases, is dispatch." The practice contended for by proponents would tend to produce considerable delay and embarrassment, if otherwise unobjectionable, and this fact constitutes a substantial reason against it, and against the argument submitted in its favor. The proponent's views therefore, upon this part of the case, are not only untenable, but the contrary view is believed to stand well supported by principle.

It is accordingly considered that all facts bearing on the due execution of the will as one possibly involving a gift within the provisions of the religious society act, and all facts incident thereto, as required to show whether the gift was or was not within said provisions, and as required to show whether the kind of probate essential to the validity of the gift under said act would be demanded to uphold said gift, were regularly open to proof on the probate hearing.

It remains to consider the points arising under the second and third heads. Upon the trial, the counsel for proponents made several requests to charge, which were refused, but the two following are alone material to our present inquiry.

*First :* That the language in *Compiled Laws, section* 2032, " *connected or to be connected with,*" must be construed to mean " such connection as is contemplated and provided for by the acts of incorporation of the Kalamazoo College, and whether it is so connected is a question to be determined on inspection of the charter alone; and there is no such connection existing or to exist between the college and any religious denomination as is meant by said section."

*Second :* That the connection meant by the statute is "not a mere connection of convenience or expediency, but

such a connection as may be enforced by law, and from which the college cannot, of its own act, relieve itself." Upon declining to advise the jury as thus requested, the Circuit Judge charged that the contestants claimed that the gift to the college was void on the ground that when the will was made, the college was an educational institution, connected with the Baptist Convention of the State of Michigan; that it was for contestants to prove such claim; that to do so they had offered evidence tending to show that the college was, at the time of making the will and codicil, an educational institution connected with the Baptist State Convention, a religious society, and that the jury should find, from the evidence, whether the said Kalamazoo College was, at the time of the execution of said will and codicil, an educational institution connected with the Baptist State Convention, and whether the said Baptist State Convention was a religious society."

Upon the argument before us the counsel for proponents insisted that to bring the case within the religious society act, the connection there mentioned must be organic, and provable by the act of incorporation, if one existed; and if none existed, then, by the articles of association or by-laws, or by the proceedings when the connection should be consistent with the articles and by-laws; that the Kalamazoo College was a chartered body, and not by its charter connected with the convention, nor empowered by it to connect itself with a religious society, but that there were many charters for educational purposes, and among them that of Albion College, within the act; and that the Circuit Judge failed to explain to the jury in any manner the intent and meaning of the statute.

It is not unworthy of notice that if the hearing on the probate should be circumscribed as insisted on by proponents, it could not be known, in a legal sense, whether the college was incorporated or not, or in what manner it was constituted; and hence, whether it possessed the power to

connect itself with a religious body or not, or the manner in which it could legally become connected if possessed of the power. Passing by this point, it is to be observed that the special act heretofore mentioned, bears upon its face the evidence of having been drawn with great care, and that it is unreasonable to suppose that any leading and emphatic word was used without due attention to its scope and meaning. The word "connected," in the place assigned to it, answers to this description; and it must have been intended to express the thought of the legislature. In order to determine what that thought was, it is necessary to apply the proper rule for ascertaining the meaning of the word. That rule is given in the following terms, in the first subdivision of § 2, *of Chap.* 1, *Comp. L.* "All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." The word in question had certainly acquired no peculiar meaning. That it was not techical, or used in a technical sense is too plain for argument.— *The People ex rel. Hughes v. May*, 3 *Mich.* 598.

The legislature must then have intended by the word "connected," the thought which that word represented according to the "common and approved usage of the language."

According to that usage at the time the act was passed, the word in question denoted any relation, whether organic or conventional by which one was "linked" or "united" to another. The word "affiliated," as sometimes used, was quite synonymous with it. Webster defines affiliated societies as follows: "Local societies, connected with a central society, or with each other."

It is evident that the sense of the term used required that the related bodies should severally continue to exist,

since one body could not be said to be connected with itself; and hence any relation involving an extinguishment of either body must have been excluded.

The statute could not have intended, then, that the specified connection should consist in the merger of one body in the other, or the consolidation of the two.

On the other hand, it is equally evident that the connection mentioned was not supposed to consist in the mere interchange of kind offices, or the bestowal of patronage; though these would be admissible as tending to prove the relation in fact between the two bodies. Still the conjunction contemplated must have been of a kind which, in fact, would have been possible between such bodies. Upon consideration of the whole matter, it may be stated that the only union consistent with the requirements of the subject matter and the meaning of the terms employed, would be one involving a community of government or of pecuniary interest more or less extensive, or involving the possession by one body of some right, power, or authority in or over the other. We may pursue the inquiry on this part of the case somewhat further, and find the result already indicated, very materially supported. The statute declares that a gift by will to an institution of learning which is connected with a religious body shall be void, unless the will is characterized by the prescribed formalities; and we are told from the bar that as the donee in this case was incorporated, the connection, if any, with the convention, must have been embodied in the charter of the former in order to have filled the meaning of the statute.

In the nature of things there must be a distinction between the state of being connected, and the mode by which the connection is accomplished; between the existence of the fact of the connection, and the mode of evidencing the fact.

Now, it is the fact of being connected, which the statute makes a prerequisite to the extraordinary formalities essential to the validity of the gift, and not the technical right

to institute the connection, or the mode of contracting it, or the nature of the evidence of the fact of connection.

The necessity for the kind of connection stated by the counsel for proponents is, therefore, not found in the meaning of the particular term, nor implied from the evident design of the statute.

Had it been the purpose of the legislature to make the necessity of the extraordinary formalities specified, depend upon the manner in which the connection should be brought about, executed or evidenced, instead of the existence of the fact of connection itself, they would have inserted in the statute the requisite provision.

The absence of all language indicating the intent imputed, in a law drawn with so much precision, and when the attention must have been earnestly directed to the instituting of relations of the kind in question, must conduce to prove that the legislature had no such purpose.

That portion of the statute bearing upon the point under examination, was considered by this court in *Ticknor's case,* 13 *Mich.* 44. It was there declared that "having provided that all religious bodies assuming corporate existence, and the control of property, must be organized in such a way as is deemed safe and expedient under our statutes, the law then proceeds in the same spirit, to prevent their obtaining gifts from private bounty, by any means which would prevent the calm and deliberate action of the donor when in the full and uncontrolled dominion of his will and mental faculties." This opinion, which received the assent of every member of the court, presents very clearly the reason for that part of the enactment bearing upon this case.

There is nothing in the object of the statute, as here stated, to call for the interpretation supported by proponents. On the contrary, the reason given would tend to preclude that interpretation. The practice sought to be prevented was as likely to arise in cases when the connection

between two bodies was voluntary, as in those where it was organic; in cases where the relation would be evidenced by matters of fact, as in those where it would be shown by charters. The statute embraces equally, bodies incorporated and unincorporated. This court so decided in the foregoing case. In the argument from the bar in behalf of proponents it was admitted. It was also admitted in the same connection that the specific relation could subsist as well in the case of unincorporated, as in that of incorporated bodies; and that as to the former the conjunction could be evidenced by facts, as contradistinguished from charter proof. This is an admission that it was no part of the object of the statute to require charter proof of the connection of an unincorporated body with any other, and a concession of the non‑existence of any reason for the organic connection specified, to the extent to which unincorporated bodies should form a portion of the class of institutions within the statutory description.

Now, it is impossible to decide what was or would be the relative number of incorporated and unincorporated bodies. The latter may have been or might become the larger number. This was a circumstance within the contemplation of all, and must have been present to the legislature. The statute, however, supposes the mischief to be the same in all cases, and does not attempt to distinguish the grievance to be produced in case of one kind of connection from that to be produced in case of another; but it aims at the fact of connection alone, without any regard to the nature of it, or to the manner in which it should be evidenced.

It can not be overlooked that it was competent for the legislature, had it been deemed requisite, to have prescribed a mode and kind of connection for unincorporated bodies, as high and assuring as that called organic; and that the necessity therefor was as imperious as in case of incorporated bodies. This was not done, however. The argument for

proponents admits that it was not done. It must be admitted also that the same word was used to denote the connection in all cases. In order, however, to maintain the position that an organic connection was intended for incorporated bodies, it has been found necessary to insist on the part of proponents, that the same word, in the same place, was imperatively intended to require very different things when applied to the different bodies to which it immediately referred, while no reason existed in the object of the enactment for any difference whatever of the nature contended for.

It is hardly credible that the legislature designed an interpretation which could only be established by arguments so unusual, and when the insertion of a common word would have rendered all argument unnecessary.

Another proposition is advanced in the name of proponents which deserves some attention. It is, that the college had no power to contract a connection with the convention, and that supposing one in fact to have been consummated, it must nevertheless have been invalid, and hence without effect as to the capacity of the college or the formalities of the will.

It is to be presumed that this argument is made in the interest of the college, since the latter alone could derive any benefit from it. It involves the proposition, that admitting a connection in fact to have been contracted by the college, yet that the latter may show, in order to obtain the testater's bounty, that its own action in forming the relation was unauthorized and illegal.

When a party can only obtain a standing favorable to its interest by solemnly impeaching as illegal, its former and chosen position, it must be natural for the court to pause before concurring in the self-impeachment prompted under the pressure of such a circumstance.

Whatever influence this consideration ought to have in a particular case, it is apprehended that no determination is

now required as to the legal competency of the college to ally itself to the convention.

It has been already advanced that the statute was aimed at the existence in fact of the given relation, and at that alone; and that if the latter should be found to exist, whether pursuant to law or in violation of it, the danger anticipated by the legislature would be the same, and equally within the manifest purpose of the act; and that the intention to make no distinction in favor of illegal alliances, could be inferred from the nature of the thing itself, and from the fact that no language could be found indicating any such design.

Without devoting further attention to this topic it will suffice to say, that the language of the statute included all cases; that its object as much required that instances of illegal connection should be embraced, as any; and that the legislature did not mean to tolerate the supposed mischief on all occasions of illegal connection, and guard against it only when the donee should be innocent and the alliance valid.

The discussion which has taken place has disposed of every material question but one; and that, although necessarily involved, was not very much labored.

Allusion is here made to the charge of the court, touching the relation denoted by the word "connected." The circumstances attending trials at the circuit are frequently such, that neither the bar can present nor the court examine, with completeness, the many points both new and intricate which demand decision; and it is not surprising that in this case the court was unprepared to assist the jury by an explanation of the meaning of the word above quoted. The case called for an explicit statement of such meaning.

It is manifest, however, that no exposition of the kind was given, and that the jury were not told by the court what would constitute the indicated relation, but were left

to infer it from the questions made, and the discussions and decisions thereupon during the trial. It is equally manifest that these proceedings were not of a kind to enable the jury to form an intelligent judgment upon the point.

The evidence produced consisted of facts and circumstances to necessitate the inference that the connection spoken of in the statute did in fact exist. It was not produced as evidencing an express treaty of alliance, but to induce the implication that there was in fact some conventional connection. It is conceived that to this evidence no valid objection could be made, if submitted under proper instructions. But as the case was given to the jury, it is impossible to say whether they found the college to have been connected with the convention in the sense which is deemed correct, or whether they would have returned the same verdict if the meaning of the word "connected" had been truly explained to them by the court. To avoid all misconception upon this subject, it must be understood that no opinion is expressed as to whether the testimony given would or would not have authorized the present verdict under a proper charge upon the point suggested; and any opinion upon that question would at this time be unwarranted.

It is only necessary to say, in conclusion, that the views here submitted necessitate the trial of the case before another jury, under proper instructions as to what would constitute a connection, as intended by the statute; but that no other ground is perceived for reversing the proceedings below.

The verdict and judgment below are set aside and a new trial ordered, and costs to abide the event; but the plaintiffs in error will recover costs of this court.

COOLEY CH. J. and CRISTIANCY J. concurred.

CAMPBELL J.

I concur entirely with the views expressed by my brother Graves, concerning the necessity of settling the questions relating to the compliance by the testator with the terms of the Religious Society Act, upon the probate of the will.

I also concur in reversing the judgment; but as my views differ from his upon the construction of the statute, I proceed to state them as briefly as I can.

I agree that when the question arises whether a corporation has become "*connected with*" a religious society, that connection need not of necessity appear in the corporate charter. If the charter is silent upon the subject, and if there is nothing in it to forbid such a connection, I can see no reason why it may not be done by agreement as effectually as by charter. And where an agreement is made, whereby the funds of the corporation are to be controlled by or used for the benefit of a religious society, I agree fully that such a connection comes within the statute, in like manner with the more intimate relation which may be caused by a direct voice of the one in the management of the corporate concerns of the other, or in the choice of its agents or officers.

But it seems to me that where such an agreement is expressly or impliedly forbidden by the charter, so that it is in law a void contract, its nullity will prevent any such connection, inasmuch as neither party can enforce it, or exercise any effectual right or authority under it.

No doubt a corporation may, by its misfeasance, become liable to answer to the state for a violation of its charter, as well as to individuals for private grievances, but there can be no case in which, upon principles of estoppel or otherwise, any illegal contract violating the charter can be made the foundation of a right of property, or be sued upon and enforced. And I can not see how it can be any more valid to connect two institutions than for any other purpose. Neither can be compelled to respect it for a moment.

And it appears to me that nothing but some connection which can be legally made — or in other words, nothing but a union of some sort which binds the parties together (for such is the literal as well as direct meaning of the term connection), will satisfy the statute.

It was no doubt the intention of the legislature, as expressed in the statute, which is the only legal evidence of intention, to secure testators from undue influence in making a certain kind of charitable disposition of their estates. But in construing a law it was always necessary to read words, whether general or special, as applicable to and limited by the general or special purpose indicated by the statute itself, and not to refer them to foreign subjects. Under our constitution this rule becomes still more imperative, for the extension of terms beyond the scope of the title of the act avoids it, and renders the excess invalid. And it may now be necessary to make separate statutes for many things which otherwise might be embraced in a single statute. But this difficulty does not necessarily meet us here.

The statute in question is entitled: "*An act concerning churches and religious societies, establishing uniform rules for the acquisition, tenure, control and disposition of property conveyed or dedicated for religious purposes, and to repeal chapter fifty-two of the revised statutes.*"

This statute undertakes to revise the provisions of a former statute concerning organizations for religious purposes, and to lay down certain regulations concerning property. Under this title the utmost power which could be exercised by the legislature concerning property must be confined to the property of religious societies, or else to property "*conveyed or dedicated for religious purposes.*"

If property is conveyed or devised to secular persons or corporations, and not given for religious purposes, the law cannot apply to it without being to that extent unconstitutional. And we must confine the meaning of the terms used, if possible, to such an application as will harmonize

16 MICH. — 2D.

with the proper scope of the act. To my mind this is the natural as well as legal construction.

When property is devised to a corporation, and there are no restrictive terms in the devise, there is implied in all cases an understanding that it is to be applied in accordance with the charter.

An express grant to a corporation, for purposes forbidden by the charter, would need no statute to avoid it entirely. And if this statute could apply to regulate such a case of express illegality, it would allow a will to be made valid, by observing certain formalities, which is in violation of law in its very substance. Of course, no one would contend that any such effect is admissible. If the charter allows a connection to be made with another association, then a gift to either of the bodies so connected, would imply (in the absence of any restriction) a right to use the property in accordance with the terms of the connection. And if one of the bodies should be a religious society, it would be no stretch of language to consider the gift as made for religious purposes, when the connection is such as directly or indirectly to involve any concern in, or control over the funds. But if, on the other hand, a charter prohibits or prevents such a connection, a person making a gift to the corporation can not fairly be regarded as intending to apply his property to illegal purposes, or to contemplate that the beneficiaries will be faithless to their trust. The title of the statute does not refer to property which is merely *used* for religious purposes, but to property "*conveyed or dedicated for religious purposes*," and the design which brings it within the law, must be that of the donor, and not that of the donee. If the donee misapplies it, there may be means taken to compel restitution against the dishonest trustees, or to punish them for their fraud; but if a donor appoints his bounty to secular purposes, he keeps entirely outside of this statute. And if he has been induced by improper means to make a foolish appropriation, some other resort is

necessary, to remedies which are not confined to religious benefactions.

The present bequests are to Kalamazoo College, which is in every sense a secular corporation, and which is not in any way connected with any other body or corporation by its charter. Its terms are such that the college could not be made dependent upon or subordinate to any other body. It has a chartered right, which the legislature can not take away, of receiving bequests and devises, and its charter expressly requires that all such gifts shall be faithfully applied for the purposes for which they are given. It may lawfully be prevented, absolutely or conditionally, from receiving religious bequests, but not secular ones. And it is prohibited by very stringent provisions from identifying itself exclusively with any religious sect. It seems to me the statute in question does not, and lawfully can not, touch a bequest made to the general uses of such an institution, whether it has or has not entered into an unlawful association. If it was not "*conveyed or dedicated*" for a religious purpose, it is not within the law.

I do not regard the evidence in the case as legally sufficient to establish contract relations between the parties, of such a nature as the law contemplates, even if such relations would be lawful; but, inasmuch as the case goes back for a new trial, and we can not foresee how the testimony may then be presented, the discussion of the principal legal question concerning the effect of an invalid agreement to associate becomes necessary, and of primary importance.

It is not likely that any law can be devised which will prevent unequal and peculiar dispositions of property by will, but the mischief can not be lessened by enlarging the operation of any statute beyond its terms. And I have not been able to find any applicability in the statute on religious societies to the case before us.