SHELDON *v.* MILLER.[1]

1. APPEAL AND ERROR— REVIEW — QUESTIONS CONSIDERED—MATTERS NOT SUGGESTED.
   Where both parties appeal from a decree granting partial relief on a bill for an accounting, a reason why complainant cannot claim certain of the funds involved, not advanced by defendant, cannot be considered for the purpose of reversing the decree, but may be considered for the purpose of answering complainant's contention that the decree is too small.

2. EQUITY—LACHES—FRAUDULENT CONVEYANCES.
   A delay of 28 years in attempting to enforce the rights of creditors to the proceeds of certain property conveyed without any attempt at concealment by their debtor to his wife, during which time the creditors, the debtor, and the wife have died, is such laches as to bar the maintenance of a bill.

Cross-appeals from Washtenaw; Kinne, J. Submitted

[1] Rehearing denied March 17, 1908.

January 17, 1908.   (Docket No. 81.)   Decided February 15, 1908.

Bill by Sarah M. Sheldon, administratrix of the estate of Obediah Priest, deceased, against Charles R. Miller, individually, and as administrator of the estate of Amanda M. Priest, deceased, for an accounting. From the decree rendered, both parties appeal. Reversed, and bill dismissed.

*A. F. & F. M. Freeman*, for complainant.

*A. J. Sawyer & Son*, for defendant.

CARPENTER, J.   Complainant is the daughter of Obediah Priest, deceased.   She is also administratrix of his estate, and she brings this suit as such administratrix. Obediah Priest was a resident of Manchester, Washtenaw county, in this State.   He died January 8, 1879, possessed of no property and owing a considerable indebtedness. His wife, Amanda M. Priest, had, however, a fund of $4,600 which she subsequently turned over to defendant, her brother, under an agreement that, during her life, it should be used for her support and maintenance, but on her death the balance was to go to his daughters.   She died June 24, 1904.   Complainant thereafter instituted this suit, claiming said fund to be the proceeds of property transferred by Obediah Priest to his wife for the purpose of defrauding creditors.   This claim was sustained in the circuit court and a decree rendered granting complainant partial relief.   From that decree both parties appeal, defendant contending that complainant is entitled to no relief; and complainant contending that she is entitled to more complete relief.

The fund in question is in part the proceeds of the sale of a certain farm situated near Manchester, called the Conklin farm, and in part the proceeds of the sale of a mill property known as the Southern Washtenaw Flouring Mill, located in Manchester.

The Conklin farm was deeded by one Conklin to Amanda M. Priest December 5, 1874, and the deed was at once recorded. It was sold by Amanda M. Priest to one Torrey, March 8, 1878. This deed was also at once recorded. In each of these deeds the exact consideration was stated. The consideration for the purchase of this farm, except certain money that was borrowed and secured by a mortgage duly recorded, was furnished by Obediah Priest. A part of this consideration consisted of real estate transferred by Obediah Priest to Conklin. It is a fair inference from the testimony in this case that at the time this purchase was made Obediah Priest was insolvent. His only indebtedness, however,— at least, the only indebtedness of any magnitude,—was that arising from his becoming the surety for his son-in-law James S. Reynolds. This indebtedness was secured by a mortgage on the property of Reynolds and a partner. The mortgage was insufficient to pay the indebtedness, and as a result a deficiency decree for a large sum was rendered against said Obediah Priest sometime in the year 1878.

The Southern Washtenaw Flouring Mill was conveyed to Amanda M. Priest by Frances M. Reynolds, daughter of Obediah, February 5, 1878. Frances M. Reynolds was the wife of said James S. Reynolds, heretofore mentioned. No consideration was paid for this property. The conveyance was made, as stated by complainant's counsel, "to secure Priest something for his losses in his dealings with Reynolds." After the sale of the Conklin farm, which took place in March, 1878, said Obediah Priest entered into a partnership with complainant's husband, Oscar F. Sheldon, for the purpose of carrying on the Southern Washtenaw Mill. The capital used in said business consisted in part of $2,000, which Amanda loaned Obediah. This $2,000 was a part of the proceeds of the sale of the Conklin farm, and left remaining in the hands of Amanda from the proceeds of said sale less than $1,500. The milling business was carried on for less than a year, when it was closed out and the mill sold. A part of the

proceeds of said sale and of the prior sale of an engine in said mill went into the hands of Amanda, and this together with what she received from the proceeds of the sale of the Conklin farm constituted the $4,600 in controversy.

Upon the death of her husband, Amanda removed to Adrian taking with her this fund. There she was an inmate of the family of her brother, the defendant. From this time defendant seems to have had charge of this fund. He invested it and reinvested it for his sister. Most of these investments were made in his own name; some were in hers. About the year 1888 it would seem that they made an arrangement whereby she loaned to him the entire amount, and either then or subsequently an arrangement was made that his daughters should have whatever was left of said fund over and above what was needed for her support and maintenance during her life. It would seem that no effort was made to conceal the truth, for in the year 1888 defendant asked for a reduction in his assessment for taxation upon the ground of this indebtedness. The authorities reduced defendant's assessment and directed the amount of his indebtedness to be assessed against his sister Amanda.

No attempt to administer the estate of Obediah Priest, deceased,—his death occurred in 1879,—was made until after the death of Amanda, in 1904. No claim was allowed against said estate except that represented by the deficiency decree upon the foreclosure of the Reynolds mortgage.

We can see no ground upon which the creditors can claim any part of the proceeds of the sale of the mill property. They had no claim upon that property when it stood in the name of Frances M. Reynolds. She was under no obligation to convey that property to her father because he had sustained losses by her husband's conduct. She did not convey it to him. She conveyed it to his wife, Amanda, and it thereby became her property, not her husband's, and in her hands it was no more subject to the claims of his creditors than it was before it was con-

veyed. It should be said, however, that this point was not made, and it would be improper for us to consider it for the purpose of reversing the decree. We may, however, properly consider it for the purpose of answering complainant's contention that the decree is too small. *J. E. Greilick Co.* v. *Rogers*, 144 Mich. 313.

The principal ground relied upon by defendant for a reversal of the decree is that the creditors for whom this suit was instituted were guilty of laches. Their decree was rendered in 1878. This suit was commenced in 1906. During this interval of 28 years the creditors died, Obediah Priest died, and Amanda M. Priest died. Thus death has removed most of those who could have given testimony respecting the charge of fraud made in the bill, and that charge must now be proved, if proved it can be, by inferences to be drawn from records and by the testimony of complainant and her husband, who, if they are to be believed, actively participated in said fraud. It is altogether improbable that the purchase and sale of the Conklin farm escaped the scrutiny of these creditors at the time they obtained their deficiency decree. The records informed them that the property of Obediah Priest had been used in the purchase of this farm, the deed of which was taken in his wife's name. The records informed them that that farm had just been sold and the price for which it was sold. Of course, the records did not inform them how the proceeds of the sale were disposed of, but there could be but one inference, those proceeds were either under the control of Amanda or of Obediah, who was at that very time carrying on a business of considerable magnitude upon property which stood in Amanda's name. It is to be presumed that these creditors, or some one acting for them, scrutinized these transactions and their inaction proves that they decided either that there was no fraud, or that they would waive the fraud. If they decided to waive the fraud, neither their heirs nor their assigns can, after the lapse of 28 years, reconsider that decision. If they decided that there was no

fraud, it is quite probable that there was no fraud, and that if we had the testimony of those who since that time have died, we too would so decide.

We can say of this case, as was said by the supreme court of Georgia of a similar case:

" There is no principle of equity sounder, more conservative and more prolific in all the fruits of peace' than this, that he who slumbers over his rights with no impediment to his asserting them, until the evidence upon which a counterclaim is founded may from lapse of time be presumed to be lost; until the generation cognizant of the transactions between the parties has passed away, and until the original actors are in their graves, and their affairs are left to representatives, the law, in the exercise of an equitable sovereignty, presumes it to be unjust, that under such circumstances a complainant should be heard; and in nine cases out of ten, it is unjust in fact, as well as in theory. It is presumed, and the presumption grows out of the principles of human nature, developed in universal experience, that men will use reasonable diligence to get what rightfully belongs to them. Our observation of men teaches that they are more likely hurriedly to assert a false claim, than tardily to assert an equitable one. If the claim be equitable, and an adverse claim is acquiesced in, until the rights of third persons are involved, or until, from the obliterations of time, the proofs of the adverse claimant are lost, yet that equitable claim ought to yield to that general, social peace, upon which its exclusion is founded. Nor ought the demandant to complain, for, for long years the courts of justice were open to him—he might have entered, but would not. He loses his rights, because from stupidity, indifference, convenience, or some other cause, he has failed to assert them. His laches cannot be made available to him, through a visitation of wrong and disaster to hundreds of his fellows. The laws are not for the individual alone—they are also for the safety and peace of the whole State." *Akins* v. *Hill*, 7 Ga. 573.

The decree is reversed, and the bill is dismissed.

GRANT, C. J., and BLAIR, MOORE, and MCALVAY, JJ., concurred.