*In re* BARNEY'S WILL.

BARNEY *v.* BARNEY.

1. WILLS—ISSUES—CIRCUIT COURT.
   On appeal from an order of the probate court denying probate of a will, the only issue to be decided was whether the paper propounded was or was not a will, and the only thing the circuit court could do was to determine the issue, and then certify its conclusion to the probate court.

2. SAME—SUPREME COURT PRACTICE.
   On appeal to the Supreme Court from a decree of the circuit court sustaining the will, the only thing this court could

do was to determine whether proper rules were followed in the circuit court in determining the issue.

3. SAME—PROBATE COURT—ISSUES—JURISDICTION—COURTS.
Neither in the circuit court nor in the Supreme Court can the issue properly triable in the probate court be enlarged.
BROOKE, C. J., and MOORE, J., dissenting.

Error to Calhoun; North, J. Submitted November 12, 1914. (Docket No. 62.) Decided July 23, 1915.

Oliver W. Barney presented for probate the last will of Oliver Barney, deceased, which was contested by Fred W. Barney. From an order of the probate court denying the petition, proponent appealed to the circuit court. Judgment for proponent. Contestant brings error. Affirmed.

*James M. Powers* and *Walter S. Powers,* for appellant.

*Leland H. Sabin,* for appellee.

On October 9, 1896, Oliver Barney was by the probate court of Calhoun county declared to be mentally incompetent to have charge of his estate. He was at that time about 75 years of age and had been in poor health for a number of years. His only son, Fred W. Barney, was in that proceeding appointed his guardian. His estate consisted principally of a farm of some 100 acres in Calhoun county, upon which he had lived for a great many years. On the 8th day of December, 1896, he is said to have executed the following will:

"I, Oliver Barney, of the township of Bedford, the county of Calhoun and State of Michigan, being of sound mind and memory, do make, publish and declare this to be my last will and testament, in manner following, viz.:

"*First.* I will and direct that all my just debts and funeral expenses be paid in full.

"*Second.* I give, devise and bequeath to my wife Phebe J. Barney all of personal property and real estate of which I now own, consisting of a farm, containing one hundred and seven acres of land this is to wife as long as she may live and to my grandson Oliver W. Barney after my wife death is to have the farm which I now own, and the said Oliver W. Barney is to pay Fred W. Barney one hundred dollars and to his sister, Phœbe Isabel Barney, one hundred dollars and to his sister Helen L. Barney, one hundred dollars to be paid by the said Oliver W. Barney.

"I now will and bequeat that my airs do put to the amount of five hundred dollars on the lot in the semitry and remove my parents on the same and cause to be put to their graves a Marbil Mark to each of them.

"I hereby appoint Charles Beadley of the township of Bedford Calhoun county as the Execut— of this my last will and testament.

"Lastly, I hereby revoke all former wills by me at any time made.

"In witness whereof, I have hereunto set my hand and seal this the 8th day of December in the year of our Lord one thousand eight hundred and ninety six.

"————————.  [Seal.]

"On this          day of          , A. D. 189
in the county of          and State of
signed the foregoing instrument in our presence, and declared it to be h          last will and testament and as witnesses thereof, we do now, at h          request, in h          presence, and in the presence of each other, hereto subscribe our name.

"OLIVER BARNEY, residing at
                    "E. D. PORTER,
                    "WM. H. HENDERSHOT."

In April, 1897, Phœbe Barney, the wife of said Oliver Barney, petitioned the probate court of Calhoun county to enter a decree dissolving the guardianship theretofore established over her husband. After a full hearing upon that petition and on May 14, 1897, the judge of probate for said county entered an order denying the petition. In this order it is recited that

said Barney is still incompetent to have the care and custody of his person or estate. An appeal was taken from this order to the circuit court of Calhoun county, where on December 14, 1897, a stipulation having been entered into by counsel for the respective parties, an order was entered dissolving said guardianship. On the 11th day of August, 1898, said Oliver Barney executed two deeds, one to his grandson Oliver William Barney, and the other to his wife, Phœbe J. Barney. These deeds disposed of the farm which had already been devised by the will of December 8, 1896. Subsequently and on October 25, 1898, a second petition was filed in the probate court for the appointment of a guardian, and such guardian was appointed on the 1st day of December, 1899. Oliver Barney died on the 12th day of February, 1900. On the 30th day of December, 1901, Fred W. Barney, who was his sole heir at law, filed a bill in the circuit court for the county of Calhoun, in chancery, in which he charged that the deed made by Oliver Barney to Oliver William Barney, son of Fred W. Barney, and grandson of Oliver Barney, was void because at the time it was executed the said Oliver Barney was not possessed of sufficient mental capacity to make a valid conveyance of his real estate, and for the further reason that said deed was executed by said Oliver Barney as the result of undue influence exercised over him by his wife Phœbe Barney. Fred W. Barney made his son, Oliver William Barney, defendant to this bill of complaint. The record shows that a subpœna was duly issued and served upon Oliver William Barney on January 10, 1902. At that time Oliver William Barney was about 18 years of age. At the request of his father, complainant in that case, Oliver William Barney signed a petition for the appointment of a guardian *ad litem*. The petition follows:

"Petition by Defendant for the Appointment of Guardian *Ad Litem.*

"Filed February 13, 1902.

"The petition of Oliver William Barney, of the city of Battle Creek, in the county of Calhoun, and State of Michigan aforesaid, the defendant in this suit respectfully shows that your petitioner is an infant under the age of twenty-one years, to wit, of the age of eighteen years. That the bill of complaint in said cause was filed against your petitioner for the purpose of setting aside a certain deed made and executed by Oliver Barney and Phœbe Barney, his wife, to this defendant, dated on or about August 11, A. D. 1898, and recorded on the 23d day of February, A. D. 1900, in the office of the register of deeds of the county of Calhoun, in Liber 162 of Deeds, on page 183, upon the grounds set forth in said bill, that the said Oliver Barney was, at the time of the making of the same, mentally incompetent to make said deed, and that said deed is in fraud of the rights of said complainant as a creditor, and also as the sole heir at law of said Oliver Barney, deceased.

"And your petitioner further shows that his interest in said suit is this, that he is the grantee named in said deed, and that your petitioner has been served with a subpœna in said cause requiring him to appear and answer to said bill, and that the same was served on the 10th day of January, A. D. 1902.

"Your petitioner therefore prays that Edward Austin, the register of this court, residing in the city of Battle Creek, in said county and State, may be appointed the guardian *ad litem* for your petitioner to appear and defend this suit in his behalf, and your petitioner will ever pray.

"OLIVER WILLIAM BARNEY, in person.

"I hereby consent to become guardian *ad litem* of the above petitioner in the above-entitled cause.

"Dated February 3, A. D. 1902.

"EDWARD AUSTIN."

An affidavit as to its execution accompanied the petition as follows:

"Calhoun County, ss.:

"Fred M. Wadleigh of said county being duly sworn

deposes and says that on the 17th day of January, A. D. 1902, he saw the above-named Oliver William Barney, to him personally known, sign the petition hereto annexed, and that on the 3d day of February, A. D. 1902, he also saw Edward Austin, to him personally known, sign the consent to act as guardian *ad litem* thereunder written.

"FRED M. WADLEIGH.

"Subscribed and sworn to before me this 6th day of February, A. D. 1902.

"LESLIE E. CLAWSON, Notary Public."

The guardian *ad litem* filed an answer to the bill of complaint neither admitting nor denying the charges of mental incompetency and undue influence made against his grandfather. To this answer a replication was filed, and the cause went to a hearing in open court. A decree was rendered therein holding that at the time said deed was made Oliver Barney was mentally incompetent; that he was indebted to the said complainant; that said deed was made without consideration; that no legal delivery thereof was ever made; and that said deed was in fraud of the rights of said complainant both as a creditor and as an heir at law of said Oliver Barney. It was further ordered and decreed:

"That the said lands and premises in said deed and in the bill of complaint described, after the payment of the just debts of the said Oliver Barney, deceased, be decreed to be the property and estate of the said complainant as sole heir at law of the said Oliver Barney, deceased, and that a copy of this decree may be recorded in the office of the register of deeds of said county of Calhoun."

This decree was filed June 5, 1902.

The will in issue in this case was filed for probate July 28, 1913. The record does not disclose where the will was from the time it was made in 1896 until about the year 1903 or 1904. It is the claim of Oliver William Barney, the proponent of the will, that when

he was about 21 years of age, upon entering his bedroom in his father's house one evening, he discovered the will in an envelope upon his bed, that he took the will from the envelope and read it, and filed it away in a letter clip in his room, where it remained until shortly before it was presented by him for probate, a period of from seven to ten years. The proponent received a fair education and after graduating from school took a year in business college. He then worked for an ice company in Battle Creek for a year or two, and then went into business with his father, which they continued until January, 1913. At that time proponent was about 30 years of age. During all the years while he was in partnership with his father he lived at home, as he had done from the time of his birth. When the will was offered for probate in the probate court, the proponent testified that he had never mentioned the fact of its existence to anybody until he had shown it to Mr. Clapp, a lawyer, a short time before it was offered for probate. Upon the trial in the circuit court he testified that he had discussed it with his mother and was of opinion that he had shown it to her. His mother denied that she had ever heard of the existence of the paper until the proceedings were had thereon in the probate court.

Fred W. Barney, as guardian, made claims against the estate for various sums paid out by him as guardian, which were allowed at the sum of nearly $500. These claims were not paid, however, as by the decree of the court of chancery the title to Oliver Barney's farm was vested in Fred W. Barney, his sole heir at law, subject to the payment of debts. The record does not disclose that there were other creditors. On March 27, 1901, contestant Fred W. Barney entered into an arrangement with his mother, Phœbe J. Barney, by the terms of which she leased to him the lands covered by the will during her life, in consideration of the sum

of $8 per month. She was still living when the case was heard in the court below, but her physical condition was such as to preclude the possibility of her testifying in the circuit court. The testimony she had given in probate court was read over objection of counsel for contestant.

Oliver William Barney explains his failure to produce the will and tender it for probate as follows:

"Q. When did you first know about this will, Mr. Barney?

"A. Why, I came into possession of it about seven years ago, six or seven years.

"Q. How did you come in possession of the will?

"A. I found it in my room, in my room at home, at my father's house. It was lying on the bed, on my bed in my room. I do not know how it got there. I did not see any one put it there.

"Q. What did you do with it?

"A. I looked it over and put it in a file where I kept some other papers.

"Q. What was your business at that time?

"A. Well, I imagine I was with my father in the coal business.

"Q. Do you know whether you were or not? What is the fact about it, don't imagine about it?

"A. Well, I would not be sure. I would not be sure whether I was with him then or not.

"Q. Now, will you tell the jury why you did not at once proceed to probate this will?

"A. After my grandfather's death, I had a talk with my father in regard to the property, or he had a talk with me, and he said the property had been left so that my grandmother would have full control of it and at her death could leave it to her relatives, the Hendershot family, unless some few changes were made. He advised me to come up to Mr. Fred Wadleigh's office, an attorney here, and sign a paper that they had prepared. I went up and signed the paper, and I supposed the matter—I did not read the paper. I did not know what it was, and I supposed the matter had been settled up agreeably all the way round. I never heard it mentioned particularly. Things run

along in that way, and, knowing that my grandmother was still living, I knew nothing could be done with the farm apparently until the spring of that year, when I decided to take up farming. In the spring of this year, I went to Marshall and started looking the matter up, and found that the farm had been deeded to me, and with this will in mind, and finding this to be true, I went up to Frank Clapp to begin with.

"Q. Now, I will ask you if you knew of any deeds existing made by your grandfather prior to the spring of 1913?

"A. No, sir; I did not. I had never heard of them.

"Q. I will ask you to state if your father told you anything about the proceedings which he had taken to set those deeds aside?

"A. Only if some steps were not taken my grandmother would eventually give it to the Hendershot family, her family, at her death. He did not say that there were deeds; he did not tell me that may grandfather had deeded to me any portion of the property. At the time of my grandfather's death, I was 17 years old. At the time of these proceedings that he took when I signed this paper, I was not of age.

"*The Court*: The bill seems to have been filed November 30, 1901.

"Q. How old were you then?

"A. I would have been 18 some time during that year, in October. I lived at that time with my father. I did not know there were any proceedings. My father asked me to sign this paper. I did not know what the paper was at that time. I did not find out what that paper was. I started looking into the matter in the spring of 1913. When my father spoke to me about going up to Mr. Wadleigh's office, he said that there were some papers that would have to be changed over if we were to prevent my grandmother at her death from giving the property to her family, the Hendershots.

"Q. Did you believe what he told you?

"A. Surely. He said there was a paper up there he wished I would sign at Fred Wadleigh's office, and I went up there. Mr. Wadleigh produced the paper and I signed it.

"*Q.* Did. he tell you anything about what it was?
\* \* \*

"*A.* No, he did not. The paper was not read over to me. Mr. Wadleigh produced the paper and pen and ink."

On cross-examination he testified:

"*Q.* Was it a surprise to you to find that upon your bed, your not knowing anything about how it got there?

"*A.* It was. I was around 21 years of age at that time. I might have been 20 or I might have been 22, somewhere around near 21. I couldn't say it was within a year of the time I was 21, because I cannot remember. It was somewheres near 21."

BROOKE, C. J. (*after stating the facts*). As is usual in cases of this character, much testimony was introduced on each side touching the mental capacity of the testator. To review this testimony at large would be of no service to the profession. It is sufficient to say, that, shorn of its local color, and given alone such probative force as it is entitled to upon this record, we would find considerable difficulty in reaching the conclusion that Oliver Barney was competent to make the will in question on December 6, 1896. The jury, however, heard the testimony, and under the law they constitute the appointed agency for the determination of this as well as other disputed questions of fact. We are unable to say that this conclusion is so plainly against the weight of evidence as to require us to set the verdict aside for that reason.

Many errors are assigned by the appellant which are discussed under four heads:

"(1) Those relating to testimony admitted on behalf of the proponent, and objected to by the contestant; (2) those relating to testimony offered by the contestant and excluded by the trial court; (3) those relating to the refusal of the court to instruct the jury as requested by contestant's counsel; and (4)

those relating to the charge to the jury as given by the trial court."

Under the first group, objection was made to the admission of the instrument in question, because it was not executed according to the laws of the State of Michigan, not signed and witnessed according to the requirements of the statute, not established or proven to be the will of Oliver Barney, no competent testimony to establish the competency or capacity of Oliver Barney to make the will, no evidence to show at what date, if any, Oliver Barney signed the paper in question. It does not appear that it is signed by Oliver Barney as a will, the name "Oliver Barney" appearing on the paper appears in the place of a witness, and there is no date or anything to show when it was witnessed. The will is not proven within the meaning of the statute.

These several objections were overruled by the court, and the paper was admitted in evidence. One of the subscribing witnesses was sworn. This witness was old and nearly blind, and his testimony was somewhat contradictory and unsatisfactory; but, taken as a whole, we are satisfied that he gave evidence fairly tending to show that the paper in question was executed by Barney in his presence, and in the presence of Porter, the other witness, and that he, Hendershot, and Porter executed the paper as witnesses in the presence of Barney. The proponent then introduced evidence tending to show that Porter, the other witness, could not be found. It is urged on behalf of contestant that this showing was insufficient. It is claimed that section 10992, 4 How. Stat. (2d Ed.), compels the proponent to produce both witnesses to a will in case of a contest as to its validity. We think the statute demands no such construction. It is true that, in cases where the probate of a will is contested, the unexplained absence of one of the witnesses is re-

garded with suspicion; but the production of both is not mandatory. *Abbott* v. *Abbott*, 41 Mich. 540 (2 N. W. 810). The effort made by the proponent in the case at bar to ascertain the whereabouts and procure the attendance of the witness Porter would appear to have been conducted in good faith and should, we think, be held to be sufficient, especially in view of the fact that contestant's counsel offered no evidence tending to show that the attendance of Porter could have been procured.

It is the claim of the contestant that the alleged will was revoked by the making of the deed in August, 1898. This claim we think is without force when it is considered that complainant himself secured a decree in the circuit court setting aside that deed upon the ground that Oliver Barney was at the time it was made incompetent to make a conveyance of his estate. It is the same, therefore, as if no deed had been made. It cannot be said that an abortive attempt made by an incompetent person to change the condition of his estate has the effect of revoking a valid will made prior to such attempt. *Graham* v. *Burch*, 47 Minn. 171 (49 N. W. 697, 28 Am. St. Rep. 339) ; and *Smithwick* v. *Jordan*, 15 Mass. 113.

The next assignment of error discussed is No. 43, and refers to the following request to charge, which was refused:

"I further instruct you that it appears by the records of the probate court for this county that on the 9th day of October, 1896, it was adjudged and determined by the probate court that Oliver Barney was mentally incompetent to have the charge and management of his person and his property. And, if you believe from the evidence that he was mentally incompetent at that time to make the alleged will, then you should, by your verdict, set said will aside unless the proponent, Oliver W. Barney, has proven to you by a fair preponderence of the evidence that, on the 8th day of December following the appointment of said guardian,

Oliver Barney had recovered his mental faculties to such an extent as to make him competent to execute the alleged will in question; and, unless the proponent has satisfied you by a preponderance of the evidence that Oliver Barney had recovered his mental competency, you should set aside this alleged will by your verdict."

The court upon this question charged as follows:

"Proof has been offered here, gentlemen, relative to proceedings in the probate court, and in the circuit court of this county, pertaining to the matter of a guardianship over Oliver Barney. I say to you, as a matter of law, that the fact that Mr. Barney was under guardianship would not be a circumstance or condition which would necessarily prevent him making a valid will. The testimony relative to these proceedings must be considered by you in connection with all the other proof in the case, and from it all you must decide whether the testator at the time in question was mentally competent to make this will in question, and also decide whether in the making of this will Mr. Oliver Barney was subjected to undue influence."

We are of opinion that this portion of the charge is warranted by the holding of this court in *Rice* v. *Rice,* 50 Mich. 448 (15 N. W. 545), where it is said:

"Testamentary capacity is not therefore disproved by the determination that cause exists for guardianship."

Counsel for contestant cite two cases from foreign jurisdictions which would indicate a contrary conclusion, but in view of our own decisions on the point we cannot follow them. It is elementary that less mental capacity is required to make a valid will than to make contracts. Guardians are frequently appointed for the purpose of preventing the making of unwise contracts by persons whose estates are thus preserved.

Error is assigned upon the following excerpt from the charge:

"I also say to you, gentlemen, that delay in presenting this proposed will here does not in any way invalidate or make it less entitled to probate than if it had been presented when first discovered by the proponent, if you find that it otherwise was a valid and sufficient will. Something has been said to you, in the course of arguments relative to the will, relative to the duty of one to produce a will upon the death of the testator; and I will say to you that we have a statute which provides that any person, other than a judge of probate, who is possessed of such an instrument, is in duty bound to produce it to the judge of probate or to the executor, if one is named in the will, within 30 days after the death of the deceased; and, notwithstanding that is a statutory duty, the mere fact that the proponent in this case has not presented the will before does not of itself deprive the will of validity if it otherwise has the essentials necessary for a valid instrument of that character."

In our opinion this instruction raises the most serious question in the case. Section 10987, 4 How. Stat. (2d Ed.), provides as follows:

"Every person other than the judge of probate, having the custody of any will, shall, within thirty days after the knowledge of the death of the testator, deliver the same into the probate court, which has jurisdiction of the case, or to the person named in the will as executor."

Section 10989, 4 How. Stat. (2d Ed.), follows:

"Every person who shall neglect to perform any of the duties required in the two last preceding sections, without reasonable cause, shall be liable to each and every person interested in such will, in the sum of ten dollars damages for each and every month he shall so neglect, after the thirty days above mentioned, to be recovered in an action on the case, with costs."

In the case of *Foote* v. *Foote,* 61 Mich. 181 (28 N. W. 90), the proponent of the will, who was also administrator, withheld the will from probate for a period of 14 years after the death of the testator. It was there said:

"But it is very certain that justice to all parties interested in the provisions of a will requires that, under the statutes in this State as they now exist, a party holding the will, or one having knowledge of its existence, and under which he claims an interest in the legacies, must secure its probate within a reasonable time after he knows of the death of the testator; or, failing so to do, he may bar himself from making claim under its provisions to the benefits thereof; and we think a lapse of 14 years after a knowledge of the death of the testator, under such circumstances (and as they appear in this record), an unreasonable time, and that such defense to the claim of the plaintiff sought to be enforced against the estate of Elisha was a proper one to be made.

"Every person having the custody of any will is required, within 30 days after he knows of the death of the testator, to deliver the same into the probate court having jurisdiction of the case, or to the executors named therein. And it is made the duty of the judge of probate to appoint a time and place for proving it, and give notice thereof, either personally or by publication, to the persons interested; and, if no sufficient cause is shown on the hearing against it, on proofs made by at least one of the subscribing witnesses, admit the same to probate. How. Stat. §§ 5797-5802, inclusive.

"It must be a case of extraordinary circumstances indeed that would permit a legatee under a will, or the executor named therein, or other person, who has had the custody of a will, or knowledge thereof, and who has disregarded the statutory provisions herein referred to, and allowed the period of the statute of limitations to elapse without delivering it to the probate court or securing probate thereof, to enforce claims in favor of the estate of the testator wherein such person is interested against its debtors or their estates, when the latter makes defense as in this case."

In the case at bar Oliver Barney died February 12, 1900. His will was tendered for probate on July 28, 1913, nearly 13½ years thereafter. The proponent testified that he was 21 years of age in 1904 and that he discovered the instrument when he was "around"

21 years of age; that he might have been 20, 21 or 22 years of age. Taking this statement as true, it follows that, with knowledge of the death of his grandfather, and with knowledge of the contents of the will, he retained the will in his possession, telling no person of its existence, for nine years. He was a man of education and affairs, and must be held to have known the law as it affected his rights and duties under the will. At the time of its discovery by him, his grandfather had been dead four years, and the will itself was then about eight years old. At the time it was made the testator was a very old man—75 years of age. Circumstances strongly indicate that the question of his grandfather's competency to make the will would be raised. The testator's capacity to make a deed dated six months after the date of the will was raised by proponent's father in the circuit court in a direct proceeding in which proponent himself was defendant, and it was there determined that Oliver Barney was incompetent. In the lapse of years which followed proponent's discovery of the instrument, it is inevitable that some of those, best fitted through acquaintance with the testator to testify as to the competency or incompetency of Oliver Barney at the time the will was made, must have died or removed from the neighborhood so that their testimony was not available upon the hearing.

The law contemplates, and the statute provides, that immediately upon the death of a person dying testate, his will shall be tendered for probate, and the very purpose of this salutary provision is that questions affecting the validity of the instrument tendered may be determined as nearly as may be to the date of its execution.

We think it would be grossly inequitable and would lead to many abuses, if a precedent were established to the effect that one *sui juris*, well educated, and largely

interested, could wilfully withhold from probate a will for a period of nine years, and then tender it at a time when it is difficult, if not impossible, to produce the testimony as to the validity of the instrument that would have been available had it been seasonably tendered.

Under the circumstances of this case, and in view of the fact that the record fails to disclose any valid reason or excuse for withholding the will from probate, we are of opinion that proponent should be held to be estopped from taking anything under the instrument.

Upon the question of laches, see *Sheldon* v. *Miller*, 151 Mich. 283 (114 N. W. 1015), and the authorities there cited.

Error is assigned upon the refusal of the court to grant contestant's twentieth request to charge, as follows:

"I instruct you that it is undisputed in this case that in the circuit court for the county of Calhoun, in chancery, after the death of Oliver Barney, a decree was made determining that Fred W. Barney was the legal owner of the real estate mentioned in the alleged will, and the proponent, Oliver William Barney, having been made defendant in that cause, said Oliver William Barney is now estopped by said decree to claim any rights under the alleged will, and you should set the same aside."

In connection with this request, it is the contention of the contestant that the decree in the chancery cause wherein Fred W. Barney was complainant, and his son, Oliver William Barney, the proponent of the will, was defendant, in which Fred W. Barney was adjudged to be the owner of the lands mentioned in the will, estops the proponent Oliver William Barney from claiming anything under the alleged will. It should be noted that the bill of complaint in that cause avers

187 Mich.—11.

that Oliver Barney died intestate, and that the complainant Fred W. Barney was his sole heir at law, and prays not alone that the deed from Oliver Barney to Oliver William Barney be set aside, but also that the lands mentioned in said deed be decreed to be the property of Fred W. Barney. The decree made in the cause follows the prayer of the bill and confirms the title to the said lands in Fred W. Barney. This decree was rendered before the proponent was 21 years of age. He attained his majority, however, shortly thereafter, and for nine years has permitted a decree which absolutely disposes of any possible rights that he might have in the property in question. If, as his testimony now seems to indicate, his failure to insist upon his rights in that proceeding was induced by fraudulent and untruthful statements made to him by his father, it became his duty upon reaching his majority, or within a reasonable time thereafter, to take steps to secure a reformation of that decree. His failure to do so and his long acquiescence in the decree as entered should now be held to estop him from questioning any of its terms, as was said in the case of *Campau* v. *Van Dyke*, 15 Mich. 371:

"But sound public policy and a just regard for the stability of private rights require that the solemn judgments and decrees of courts affecting the rights of property shall not be lightly disturbed, nor, without the strongest reason, allowed to be impeached after any considerable period of time, during which the parties have been allowed to rely upon them, and others may have obtained interests on the faith of them, or the evidence by which they might have been sustained has been lost. And if a party to such judgment or decree might, after any considerable period, impeach its validity without showing a proper excuse or reasonable justification for the delay; and especially when it appears probable that material evidence to sustain it may, in the meantime, have been lost, a general feeling of insecurity and distrust, very in-

jurious to property and business, must naturally result.

"For these reasons, we think, in a case like the present, a party seeking to set aside the decree must satisfy the court that he has not slept upon his rights, and that his delay for any period after he was aware of his rights, and competent to prosecute them, has not operated to the prejudice of the other parties, nor deprived them of any of the evidence or other means for sustaining the decree, which they might have possessed had he brought his bill at as early a period as he might. In other words, we think the only just rule which can be laid down upon this point is that such a bill must be brought within *a reasonable time,* having reference to the *nature* and *all the circumstances of the particular case."*

See, also, *Harlow* v. *Iron Co.,* 41 Mich. 583 (2 N. W. 913); *Birdsall* v. *Johnson,* 44 Mich. 134 (6 N. W. 226); *Douglass* v. *Douglass,* 72 Mich. 86 (40 N. W. 177); and *Corby* v. *Trombley,* 110 Mich. 292 (68 N. W. 139).

The judgment should be reversed, and no new trial granted.

MOORE, J., concurred with BROOKE, C. J.

OSTRANDER, J. The only question for court and jury in this cause was: Is the will proposed the last will of the testator? The trial court so ruled. In *Frazer* v. *Circuit Judge,* 39 Mich. 198, it was said:

"It was held in *Allison* v. *Smith,* 16 Mich. 405, which discusses several considerations relevant to this motion, that the probate of every will, whether in the original or appellate tribunal, must always be single and complete in one hearing. It would be absurd to have such proceedings severed, so that a will might be held good as to one class of contestants and bad as to another. No matter how many different persons appeal, they can only raise one issue, and there can be but one trial of that issue, which is to determine the question of will or no will. That is the only

issue that can be raised and the only one to be decided."

In *Re Hathaway's Appeal*, 46 Mich. 326 (9 N. W. 435), it was said:

"There is one main issue, and only one, and that is whether the paper propounded is or is not a will."

The only thing the circuit court can do is to determine this issue and certify its conclusion to the probate court, and the only thing this court can do is to determine whether proper rules were followed in the circuit court in determining the issue. It would be singular if the probate court was to assume to decide that because of the laches of a custodian of a will, or of a legatee or devisee, it would not determine the validity of a will presented for probate; more singular if it should assume to determine that the paper propounded was a will, but that, for various reasons, the legatee, or devisee, could claim no rights under it. Neither in the circuit court nor in this court can the issue properly triable in the probate court be enlarged.

The judgment should be affirmed.

KUHN, STONE, BIRD, and STEERE, JJ., concurred with OSTRANDER, J.

The late Justice MCALVAY took no part in this decision.